**Exhibit Tag/ Cover Sheet**

**Party submitting:** Debtor/Plaintiff **Ex. #** 12

**Admitted: Yes or No (circle one)**

**Debtor:** Frazer School, Inc.

**Case No.:** 26-10181-KKS

***Adv. No.*:** 26-01014-KKS

**Nature of Hearing/**
**Docket No:** 105

Preliminary and Final Evidentiary Hearings

**Dated** ______________ **, 20___.**

**By:**______________________**, Deputy Clerk**

**From:** Reid, Rachel <RachelReid@eversheds-sutherland.us>
**Sent:** Thursday, April 16, 2026 6:25 PM
**To:** Richard Withers
**Cc:** James Schrader; Adam Roark
**Subject:** RE: Building Purchase Agreement

Hi Richard,

Yes, the best and final offer was made at the direction of my client, which is the Educator Board (as defined in the Transition Agreement).

Regards,
Rachel

**Rachel Reid** | Partner, Global Co-Head of AI and Co-Lead of Global Cybersecurity and Data Privacy | T: +1.404.853.8134 | M: +1.404.964.1324

**Eversheds Sutherland**
Helping our clients, our people and our communities to thrive

---

**From:** Richard Withers <richard@withersharvey.com>
**Sent:** Thursday, April 16, 2026 6:19 PM
**To:** Reid, Rachel <RachelReid@eversheds-sutherland.us>
**Cc:** James Schrader <jrschr10@gmail.com>; Adam Roark <adam@adamroarklaw.com>
**Subject:** RE: Building Purchase Agreement

[EXTERNAL]

Good evening, Rachel,

Thank you for your email. Your disagreement is noted.

In answer to your question, the terms of your offer set forth in the April 16th version of the Purchase Agreement are clearly outside the parameters of the Transition Agreement. As just one of many examples, please compare Section 4.5 of the Transition Agreement to Section 4.2 of the Purchase Agreement.

Additionally, we believe Frazer School to be operating in bad faith. We have reason to believe that Renasant Bank is not requiring the flow of funds set forth in Section 4.2 of your most recent version of the Purchase Agreement. If Renasant Bank is indeed requiring this flow of funds, please provide a letter to this effect from Renasant Bank that we may verify with them.

Further, Frazer School has failed to comply with most of its financial obligations under the Transition Agreement. Now, to add insult to injury, Frazer School is asking Newberry Christian to pay Frazer School's obligations under the Transition Agreement with funds that would otherwise pass to Newberry

Christian upon the sale of the property. We view these actions as a clear breach of the Transition Agreement by Frazer School.

In your emails you asked a question of me (which I answered above), now let me ask you a question. When you presented the "best and final offer" on behalf of your client earlier today, was that with the authorization and consent of your client?

Please note that Newberry Christian also preserves all rights, claims and remedies available under the Transition Agreement, at law, and in equity.

Regards,

Richard I. Withers, Esq.
Shareholder
WITHERS HARVEY P.A.
1120 NW 8th Avenue
Gainesville, Florida 32601
(352) 727-4404
www.withersharvey.com

---

**From:** Reid, Rachel <rachelreid@eversheds-sutherland.com>
**Sent:** Thursday, April 16, 2026 4:12 PM
**To:** Richard Withers <richard@withersharvey.com>
**Cc:** James Schrader <jrschr10@gmail.com>; Adam Roark <adam@adamroarklaw.com>
**Subject:** RE: Building Purchase Agreement

Hi Richard,

We strongly disagree with your position. An email exchange between counsel does not — and cannot — extinguish our client's rights under the Transition Agreement. Your conclusory assertion to the contrary is without legal or factual basis.

We also reject your characterization that our client's offer is outside the parameters of the Transition Agreement. As noted in my prior email, neither I nor Adam has identified any provision of the Transition Agreement that is inconsistent with the terms our client has proposed. You have twice made that assertion without identifying a single specific provision to support it, which gives us serious concern about the basis for your client's position.

Our client's rights under the Transition Agreement remain fully intact. We expressly preserve all rights, claims, and remedies available to our client under the Transition Agreement, at law, and in equity.

We remain prepared to close on the terms set forth in our client's proposal. Should your client fail to honor its obligations under the Transition Agreement, however, we will not hesitate to pursue all available rights and remedies.

Regards,
Rachel

**Rachel Reid** | Partner, Global Co-Head of AI and Co-Lead of Global Cybersecurity and Data Privacy | T: +1.404.853.8134 | M: +1.404.964.1324

**Eversheds Sutherland**
Helping our clients, our people and our communities to thrive

---

**From:** Richard Withers <richard@withersharvey.com>
**Sent:** Thursday, April 16, 2026 3:05 PM
**To:** Reid, Rachel <RachelReid@eversheds-sutherland.us>
**Cc:** James Schrader <jrschr10@gmail.com>; Adam Roark <adam@adamroarklaw.com>
**Subject:** RE: Building Purchase Agreement

[EXTERNAL]

Hi Rachel,

My client's position is as stated in my prior email. Your client stated a "final offer." That offer is unacceptable as it is outside of the parameters of the Transition Agreement. As the parties were not able to reach an agreement, your client's option to purchase the building pursuant to the Transition Agreement is now extinguished and of no further force or effect.

Regards,

Richard I. Withers, Esq.
Shareholder
WITHERS HARVEY P.A.
1120 NW 8th Avenue
Gainesville, Florida 32601
(352) 727-4404
www.withersharvey.com

---

**From:** Reid, Rachel <rachelreid@eversheds-sutherland.com>
**Sent:** Thursday, April 16, 2026 2:06 PM
**To:** Richard Withers <richard@withersharvey.com>
**Cc:** James Schrader <jrschr10@gmail.com>; Adam Roark <adam@adamroarklaw.com>
**Subject:** RE: Building Purchase Agreement

Hi Richard,

Other than the funds flow, which is being mandated by Renasant Bank in order to provide the loan, would you please specify which terms are "substantially different" from the Transition Agreement? Neither Adam nor I see any contrary provisions in that agreement.

Best,
Rachel

**Rachel Reid** | Partner, Global Co-Head of AI and Co-Lead of Global Cybersecurity and Data Privacy | T: +1.404.853.8134 | M: +1.404.964.1324

**Eversheds Sutherland**
Helping our clients, our people and our communities to thrive

---

**From:** Richard Withers <richard@withersharvey.com>
**Sent:** Thursday, April 16, 2026 1:53 PM
**To:** Reid, Rachel <RachelReid@eversheds-sutherland.us>
**Cc:** James Schrader <jrschr10@gmail.com>; Adam Roark <adam@adamroarklaw.com>
**Subject:** RE: Building Purchase Agreement

[EXTERNAL]

Good afternoon, Rachel,

Thank you for your client's "best and final offer" on the purchase of the building.

As these terms are substantially different from the parties' obligations pursuant to the Transition Agreement, the Seller is unable to agree to these terms. As this is your client's "final" offer and the parties were not able to reach an agreement, your client's option to purchase the building pursuant to the Transition Agreement is now extinguished and of no further force or effect.

Regards,

Richard I. Withers, Esq.
Shareholder
WITHERS HARVEY P.A.
1120 NW 8th Avenue
Gainesville, Florida 32601
(352) 727-4404
www.withersharvey.com

---

**From:** Reid, Rachel <rachelreid@eversheds-sutherland.com>
**Sent:** Thursday, April 16, 2026 1:30 PM
**To:** Richard Withers <richard@withersharvey.com>
**Cc:** James Schrader <jrschr10@gmail.com>; Adam Roark <adam@adamroarklaw.com>; Reid, Rachel <rachelreid@eversheds-sutherland.com>
**Subject:** RE: Building Purchase Agreement

Good afternoon, Richard,

Attached please find both a clean, executable draft of the Purchase Agreement, along with a redline against your prior draft.

I am happy to explain why some of the changes were rejected if that would be helpful, but from Purchaser's perspective, this is our best and final offer on the substantive terms for the purchase of the building. Of course, if you find any drafting or clerical errors, we would be happy to address those.

If your client accepts this offer, we would like him to execute the attached on behalf of NCCS, with the understanding that all of the grey highlighted areas will be updated prior to Closing.

Please feel free to reach out to either me or Adam with any questions.

Regards,
Rachel

**Rachel Reid** | Partner, Global Co-Head of AI and Co-Lead of Global Cybersecurity and Data Privacy | T: +1.404.853.8134 | M: +1.404.964.1324

**Eversheds Sutherland**
Helping our clients, our people and our communities to thrive

---

**From:** Richard Withers <richard@withersharvey.com>
**Sent:** Tuesday, April 14, 2026 2:18 PM
**To:** Reid, Rachel <RachelReid@eversheds-sutherland.us>; James Schrader <jrschr10@gmail.com>
**Subject:** RE: Building Purchase Agreement

[EXTERNAL]

Good afternoon, Mrs. Reid,

Thank you for the initial draft of the Purchase Agreement. Given the complexity of the situation and the various parties and other agreements that are involved, we believe the Purchase Agreement requires substantial revisions.

Please find attached a redline of the Purchase Agreement with Seller's revisions. To add context to certain of the more meaningful revisions, please consider the following comments:

1. We believe the Purchase Agreement should reference and work in conjunction with the existing Transition Agreement and Lease Agreement.

2. The Purchase Agreement should reference and properly account for the Equity Credit. In effect, the Purchaser is bringing loan proceeds and roughly $5.1M in Equity Credit to the Closing to arrive at the approximately $13.5M Purchase Price.

3. If Seller provides Purchaser an Equity Credit at closing equal to the full amount of all funds loaned to Purchaser and represented by bonds or promissory notes, then Purchaser should thereafter be solely responsible for any obligations in relation to such instruments, and Seller and James Schrader should be released from any and all obligations, guarantees and potential liability in relation thereto.

3. The Disbursements proposed in Section 4.2 of the draft Purchase Agreement are substantially different from the amounts agreed to in the Transition Agreement. The Transition Agreement signed by the parties does not contemplate (a) a $2.2M reserve for Seller to be held at Renasant Bank, (b) using $580k of the sale proceeds to pay off IRS Payroll Tax liability (which is the Purchaser's obligation under the Transition Agreement), (c) using $404k of the sale proceeds to pay off Purchaser's vendor obligations, (d) using $1.9M of the sale proceeds to pay amounts to the Purchaser's noteholders (recall

that Seller's obligation to Purchaser in relation to amounts that Purchaser received form the Noteholders is already accounted for in the Equity Credit), or (e) that any remaining balance would be paid to Purchaser. Further, the Purchase Agreement as drafted does not account for the "Reimbursement of Equity" that is also owed to Seller pursuant to the Transition Agreement.

4. Purchaser has not complied with its financial obligations under the Transition Agreement. If the sale contemplated by the Purchase Agreement is going to move forward, Purchaser needs to pay all amounts owed as soon as possible.

5. Purchaser (as Tenant) has been in sole possession and control of the property since December 18, 2025. Many of the revisions to the Purchase Agreement are intended to address this circumstance.

There are obviously other revisions to the Purchase Agreement which are not referenced in the above comments, but those other revisions should be fairly straightforward.

Thank you for your time and attention to these matters. If you have any questions or would like to discuss any of these matters further, I am happy to get together on a call.

Regards,

Richard I. Withers, Esq.
Shareholder
WITHERS HARVEY P.A.
1120 NW 8th Avenue
Gainesville, Florida 32601
(352) 727-4404
www.withersharvey.com

---

**From:** Reid, Rachel <rachelreid@eversheds-sutherland.com>
**Sent:** Monday, April 13, 2026 9:25 AM
**To:** Richard Withers <richard@withersharvey.com>; James Schrader <jrschr10@gmail.com>
**Subject:** RE: Building Purchase Agreement

Thank you very much. Please don't hesitate to reach out if you have any questions or would like to discuss.

Regards,
Rachel

**Rachel Reid** | Partner, Global Co-Head of AI and Co-Lead of Global Cybersecurity and Data Privacy | T: +1.404.853.8134 | M: +1.404.964.1324

**Eversheds Sutherland**
Helping our clients, our people and our communities to thrive

---

**From:** Richard Withers <richard@withersharvey.com>
**Sent:** Monday, April 13, 2026 6:57 AM
**To:** Reid, Rachel <RachelReid@eversheds-sutherland.us>; James Schrader <jrschr10@gmail.com>
**Subject:** RE: Building Purchase Agreement

[EXTERNAL]

Good morning, Mrs. Reid,

Thank you for the draft of the Purchase Agreement. Mr. Schrader and I will review and revert as soon as we can.

Regards,

Richard I. Withers, Esq.
Shareholder
WITHERS HARVEY P.A.
1120 NW 8th Avenue
Gainesville, Florida 32601
(352) 727-4404
www.withersharvey.com

---

**From:** Reid, Rachel <rachelreid@eversheds-sutherland.com>
**Sent:** Friday, April 10, 2026 3:35 PM
**To:** Richard Withers <richard@withersharvey.com>; James Schrader <jrschr10@gmail.com>
**Cc:** Reid, Rachel <rachelreid@eversheds-sutherland.com>
**Subject:** Building Purchase Agreement

Dear Mr. Withers and Mr. Schrader,

Attached for your review, please find a draft of the purchase agreement for the Frazer School building and property.

Given the transaction timeline, we would greatly appreciate your prompt review and return of any comments. We do not anticipate that the draft will require extensive revisions or substantive negotiation, and timely feedback at this stage will be important to keeping the process on track.

Thank you in advance for your attention to this matter. Please do not hesitate to let me know if there are any questions as you review.

Kind regards,
Rachel

**Rachel Reid** | Partner, Global Co-Head of AI and Co-Lead of Global Cybersecurity and Data Privacy

rachelreid@eversheds-sutherland.com
T: +1.404.853.8134
M: +1.404.964.1324
Biography
600 Peachtree Street NE, Suite 5200, Atlanta, GA 30308

**Eversheds Sutherland**
Helping our clients, our people and our communities to thrive

**Eversheds Sutherland (US) LLP is part of a global legal practice, operating through various separate and distinct legal entities, under Eversheds Sutherland. For a full description of the structure and a list of offices, please visit www.eversheds-sutherland.com.**

**This e-mail message, together with any attachments, is intended only for the above named recipient(s) and may contain privileged and/or confidential information. If you are not an intended recipient, you must not review, copy or show the message and any attachments to anyone. Please reply to this e-mail and highlight the mistaken transmission to the sender, and then immediately delete the message.**

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "*Agreement*") is made as of April ___, 2026 (the "*Effective Date*"), between **The Frazer School, Inc.,** a Florida corporation ("*Purchaser*"), and Newberry Christian Community School, Inc.**,** a Florida nonprofit corporation ("*Seller*").

## BACKGROUND:

A. Seller is the owner of that certain parcel of land consisting of approximately *___ acres, located in Alachua County, Florida, and more particularly described on Schedule A (the "*Land*").

B. Seller desires to sell, and Purchaser desires to purchase, the Property (as defined below) upon and subject to the terms and conditions set forth in this Agreement.

## AGREEMENT:

NOW, THEREFORE, for and in consideration of the foregoing premises, the mutual covenants and agreements set forth in this Agreement, and other good and valuable consideration, all of which each party respectively agrees constitutes sufficient consideration received at or before the execution and delivery of this Agreement, the parties, intending to be legally bound, agree as follows:

## ARTICLE 1

## PURCHASE AND SALE

**1.1 Agreement of Purchase and Sale.** Subject to the terms and conditions set forth in this Agreement, Seller agrees to sell and convey and Purchaser agrees to purchase the following:

(a) the Land;

(b) those rights, easements and appurtenances pertaining to the Land, including (i) all right, title and interest of Seller (if any) in and to adjacent streets, alleys or rights-of-way, (ii) strips, gaps and gores, if any, in connection with the Land, (iii) any and all oil, gas and minerals lying under, in, on or about or constituting a part of the Land, regardless of whether the minerals are considered part of the surface estate or part of the mineral estate, and (iv) all right, title and interest of Seller with respect any easements or covenants that benefit or burden the Land (collectively, the "*Related Rights*");

(c) the structures and other improvements (if any) on the Land (collectively, the "*Improvements*," and the Land, the Related Rights and the Improvements being collectively referred to as the "*Real Property*");

(d) all of Seller's right, title and interest in, to and under all governmental and non-governmental permits, licenses, consents, approvals and authorizations if any,

belonging to or inuring to the benefit of Seller and pertaining to the Real Property, to the extent that such permits, licenses, consents and approvals are assignable (collectively**,** the "*Intangible Property*").

**1.2 Property Defined.** The Land, the Related Rights, the Improvements and the Intangible Property are referred to collectively as the "*Property*."

**1.3 Permitted Exceptions.** Seller shall convey the Property, and Purchaser shall accept the Property, subject to the matters which are, or are deemed to be, Permitted Exceptions pursuant to Article 2 (collectively, the "*Permitted Exceptions*").

**1.4 Purchase Price.** Seller is to sell and Purchaser is to purchase the Property for a total purchase price of **Thirteen Million Five Hundred Thousand Dollars ($13,500,000.00)** (the "*Purchase Price*").

**1.5 Payment of Purchase Price.** The Parties expressly acknowledge and agree that (a) the Purchase Price shall be funded through loan proceeds arranged by Purchaser, (b) Seller shall receive no cash proceeds from the sale of the Property and (c) at Closing (as defined below), all loan proceeds shall be disbursed by the Closing Agent solely in accordance with the priority disbursement schedule set forth in <u>Section 4.2</u>.

## ARTICLE 2

## TITLE AND SURVEY

**2.1 Title Examination; Commitment for Title Insurance.** Purchaser shall have Seller's title to the Property examined. The report of such title examination shall be in the form of an owner's title insurance commitment (as initially issued to Purchaser, the "*Title Commitment*") issued by the title insurer.

**2.2 Survey.** On or before the Inspection Date, Purchaser may, at Purchaser's expense, have the Real Property accurately surveyed by a licensed surveyor or engineer of Purchaser's choice showing the actual boundaries of the Real Property, the acreage contained in the Land, the location of the Improvements and such other matters as Purchaser deems appropriate. Such survey shall constitute the "*Survey*." For purposes of the Deed (as defined below) to be delivered to Purchaser at Closing, the legal description of the Real Property shall be the legal description attached as <u>Schedule A</u> or such other legal description by which Seller acquired title to the Property, as elected by Purchaser. If, however, the metes and bounds description drawn from the Survey reflects a legal description different from the legal description attached as <u>Schedule A</u>, at Closing, Seller shall also deliver to Purchaser a quitclaim deed, in form and content reasonably satisfactory to Purchaser and Seller, containing the legal description drawn from the Survey.

**2.3 Title Objections; Cure of Title Objections.**

(a) Purchaser shall have until the Inspection Date to notify Seller, in writing, of such objections as Purchaser may have to the Title Commitment (including the title exception documents referred to in the Title Commitment) or the Survey, other than the

Permitted Exceptions described in clauses (a) and (b) of Section 2.4. Any item contained in the Title Commitment or shown on the Survey to which Purchaser does not object on or before the Inspection Date shall be deemed a "*Permitted Exception*."

(b) If Purchaser shall notify Seller of objections to title or matters shown on the Survey on or before the Inspection Date, Seller shall have the right, but not the obligation, to cure such objections. On or before the fifth (5th) business day from and after Seller's receipt of Purchaser's notice of objections, Seller shall notify Purchaser in writing whether Seller elects to attempt to cure such objections. Seller's failure to provide such a notice shall be deemed an election by Seller not to cure any such objection. If Seller elects to attempt to cure, and provided that Purchaser shall not have terminated this Agreement in accordance with Section 3.2 hereof, then Seller shall be obligated to cure such objection or objections. If Seller elects, or is deemed to have elected, not to cure any objections specified in Purchaser's notice, then in either such case Purchaser shall have the right to elect one, but not both, of the following options, which election must in each case be made within the time period provided in paragraph (c) below:

(1) to accept a conveyance of the Property subject to the Permitted Exceptions, specifically including any matter objected to by Purchaser which Seller is unwilling or unable to cure, and without reduction of the Purchase Price; or

(2) to terminate this Agreement by sending written notice of such termination to Seller, and upon delivery of such notice of termination, this Agreement shall terminate, and thereafter neither party to this Agreement shall have any further rights, obligations or liabilities under this Agreement except to the extent that any right, obligation or liability set forth in this Agreement expressly survives termination of this Agreement.

(c) If Seller notifies Purchaser that Seller does not intend to attempt to cure any title objection, or if Seller is deemed to have elected not to cure any title objections, then in any such case Purchaser shall, on or before the date that is five (5) business days after receiving Seller's notice or the date of Seller's deemed election, as applicable, notify Seller in writing whether Purchaser shall elect to accept the conveyance under clause (b)(1) above or to terminate this Agreement under clause (b)(2) above. Purchaser's failure to provide such a notice will be deemed an election by Purchaser to accept conveyance under clause (b)(1) above.

(d) Notwithstanding anything contained in this Agreement to the contrary, Seller shall be obligated at Closing to discharge all mortgages and other monetary liens encumbering the Property (regardless of whether Purchaser objects to such mortgage or monetary lien). (The term "*mortgage*" as used in this Agreement includes any mortgage, deed of trust, deed to secure debt and similar security instrument securing an indebtedness of Seller and encumbering the Property or any portion of the Property; the terms "*discharge*" and "*discharged*" as used in this Agreement include compliance with a

statutory bonding procedure that has the legal effect of removing the mortgage or other item as a lien on the Property).

**2.4 Conveyance of Title.** At Closing, Seller shall convey and transfer the Property to Purchaser. It shall be a condition to Purchaser's obligation to close this transaction that the title company shall have issued the Title Policy to Purchaser (or unconditionally committed to issue the Title Policy to Purchaser upon receipt of the title insurance premium for such Title Policy). **"***Title Policy***"** means an extended coverage American Land Title Association (ALTA) Form 2021 Owner's Policy of Title Insurance (or such other comparable form of title insurance policy as is available in the jurisdictions in which the Real Property is located) insuring Purchaser's fee simple title to the Real Property, in the full amount of the Purchase Price with the standard exceptions deleted, subject only to the following matters, which shall be deemed to be Permitted Exceptions, and including the endorsements set forth in Schedule 2.4:

(a) the lien of all ad valorem real estate taxes and assessments not yet due and payable as of the Closing Date (as defined below), subject to proration and adjustment as provided in this Agreement;

(b) local, state and federal laws, ordinances or governmental regulations, including but not limited to, building, zoning and land use laws, ordinances and regulations, now or hereafter in effect relating to the Property;

(c) additional items, if any, appearing of record or shown on the Survey, approved or deemed approved by Purchaser pursuant to Section 2.3 or 2.5 hereof; and

(d) additional items, if any, approved by Purchaser pursuant to Section 5.3(e) hereof.

**2.5 Pre-Closing "Gap" Title Defects.** Whether or not Purchaser shall have furnished to Seller any notice of title objections pursuant to the foregoing provisions, Purchaser may, at or before Closing, notify Seller in writing of any objections to title first raised by the title company or the surveyor after the effective date of the Title Commitment or Survey, as appropriate; provided, however, that Purchaser must notify Seller of any such objections on or before the date that is ten (10) business days after Purchaser's first receipt of the updated title commitment or updated survey, whichever first provides notice of the condition giving rise to any such objection. With respect to any objections to title set forth in such notice, Seller shall have the same option to cure and Purchaser shall have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any notice of objections made by Purchaser on or before the Inspection Date.

## ARTICLE 3

## INSPECTION PERIOD

**3.1 Right of Inspection.**

(a) Beginning upon the Effective Date and continuing thereafter so long as this Agreement remains in full force and effect, Purchaser shall have the right to physically inspect the Property, and Purchaser, personally or through agents, employees or contractors, may go upon the Property during normal business hours or at other reasonable times to make boundary line or topographical surveys and to conduct such studies, tests, samplings, investigations and analyses of any and all aspects of the Property as Purchaser deems desirable, including, without limitation, engineering, environmental, soil, and groundwater and other tests, samplings, investigations and studies of the Property.

(b) In addition to any other obligation to assist Purchaser in the inspection of the Property, Seller agrees to deliver to Purchaser, on or before the date that is five (5) days after the Effective Date, true and correct copies of all materials described on Schedule 3.1(b) (collectively, the "*Property Documents*"), to the extent Seller has not already done so.

**3.2 Right of Termination.** Seller agrees that if Purchaser determines, in Purchaser's sole discretion, that it does not wish to acquire the Property for any reason or no reason, then Purchaser shall have the right to terminate this Agreement by giving written notice of such termination to Seller on or before __________ __, 2026 (the "*Inspection Date*"). Upon any such termination of this Agreement pursuant to Purchaser's rights under this Section 3.2, Purchaser and Seller shall have no further rights and obligations under this Agreement except those which expressly survive termination of this Agreement. The period commencing on the Effective Date and ending on the Inspection Date is sometimes referred to in this Agreement as the "*Inspection Period*."

## ARTICLE 4

## CLOSING

**4.1 Time and Place.** The consummation of the transaction contemplated by this Agreement ("*Closing*") shall be held at the offices of _________________ at __:00 _.m. (Gainesville, Florida local time) on ___________ __, 2026 (or such extended date as may be provided under other provisions of this Agreement). The Parties shall designate a mutually acceptable licensed title company or closing attorney located in Florida, to serve as the closing agent ("*Closing Agent*"). At Closing, Seller and Purchaser shall perform the obligations set forth in Section 4.4 and Section 4.5, respectively. Closing may be held at such other place or such earlier time and date as Seller and Purchaser shall mutually approve in writing. The date on which Closing is scheduled to occur under this Agreement (or, if earlier, the date on which Closing occurs) is referred to in this Agreement as the "*Closing Date*." Purchaser shall have the right to extend the Closing Date by two (2) periods of thirty (30) days each by providing Seller with written notice of such extension at least three (3) days before the then-scheduled Closing Date.

**4.2 Disbursement by Closing Agent.** At Closing, the Closing Agent shall disburse all loan proceeds in the following strict priority order, without deviation, and Seller hereby irrevocably authorizes and directs the Closing Agent to make such disbursements:

| Priority | Payee / Purpose | Approximate Amount |
|---|---|---|
| **(1)** | **Renasant Bank** / Restricted Reserve Account | $2,250,000.00 |
| **(2)** | **Capital City Bank** / existing mortgage payoff | ~$4,100,000.00 |
| **(3)** | **Joiner Construction and other holders of outstanding construction and renovation liens** / satisfaction of all outstanding construction/renovation liens | ~$3,500,000.00 |
| **(4)** | **The Frazer School, Inc.** / payment of principal IRS payroll tax liability | ~$580,000.00 |
| **(5)** | **The Frazer School, Inc. /** payment of outstanding vendor accounts payable, including approximately $200,000 to architect and remaining vendor obligations | ~$404,000.00 |
| **(6)** | **Holders of outstanding promissory notes listed on Schedule 4.2 /** principal reduction and accrued interest payments | ~$1,900,000.00 |
| **(7)** | **The Frazer School, Inc. /** unrestricted working capital | ~$750,000.00 (or remaining balance) |

**4.3 Final Disbursement Schedule.** The Parties acknowledge that the amounts set forth in Section 4.2 are approximate. The Closing Agent shall prepare a final, itemized Closing disclosure and disbursement schedule no fewer than three (3) business days prior to the Closing Date, reflecting exact payoff amounts, lien releases, and final loan proceeds. The Parties shall review and approve the final disbursement schedule prior to Closing.

**4.4 Seller's Obligations at Closing.** At Closing, Seller shall:

(a) deliver to Purchaser a special warranty deed in the form attached as Schedule 4.4(a), duly executed by Seller, pursuant to which Seller shall convey the Real Property to Purchaser subject only to the Permitted Exceptions (the "*Deed*");

(b) deliver to Purchaser a blanket bill of sale and assignment, in the form attached as Schedule 4.4(b), duly executed by Seller, pursuant to which Seller shall convey the Intangible Property to Purchaser (the **"***Bill of Sale and Assignment*");

(c) deliver to Purchaser a certificate ("*Seller's Closing Certificate*"), dated as of the Closing Date and duly executed by Seller, in the form of attached as Schedule 4.4(c), stating that the representations and warranties of Seller contained in Section 5.1 are true and correct in all material respects as of the Closing Date;

(d) deliver to Purchaser such evidence as Purchaser's counsel and/or the title company may reasonably require as to the authority of the person or persons executing documents on behalf of Seller;

(e) deliver to Purchaser an affidavit duly executed by Seller stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act;

(f) deliver to the title company a title insurance affidavit, duly executed by Seller or a representative of Seller, in form and content reasonably satisfactory to Purchaser and the title company and sufficient for the title company to issue the Title Policy (as defined below);

(g) deliver to Purchaser such certificate or affidavit, if any, as is required under applicable provisions of Florida law and regulation, to assure Purchaser that Florida tax withholding is not required. If Seller fails to deliver such certificate or affidavit, and otherwise fails to provide Purchaser reasonably satisfactory assurance that withholding is not required, then Purchaser shall be entitled to withhold applicable Florida taxes if and to the extent required by applicable Florida law and regulation;

(h) deliver such additional documents as shall be reasonably requested by the title company or Purchaser or required to consummate the transaction contemplated by this Agreement;

(i) if the legal description attached as Schedule A differs from the legal description of the Property drawn from the Survey, then Seller shall at Closing deliver (in addition to the Deed) a quitclaim deed, in form and content reasonably satisfactory to Purchaser and Seller, conveying the Real Property pursuant to the legal description drawn from the Survey;

(j) deliver broker's lien waivers in form and content reasonably satisfactory to Purchaser and the title company; and

(k) deliver to Purchaser possession and occupancy of the Property, subject only to the Permitted Exceptions.

**4.5 Purchaser's Obligations at Closing.** At Closing, Purchaser shall:

(a) deliver to Seller such evidence as Seller's counsel and/or the title company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser;

(b) deliver such additional documents as shall be reasonably requested by the title company or Seller or required to consummate the transaction contemplated by this Agreement, provided, however, that in no event shall Purchaser be required to undertake any other material liability not expressly contemplated in this Agreement, unless Purchaser elects to do so in its sole discretion.

**4.6 Credits and Prorations.**

(a) All income and expenses in connection with the operation of the Property shall be apportioned, as of 12:01 A.M., on the Closing Date, as if Purchaser were vested with title to the Property during the entire Closing Date, such that, except as otherwise expressly provided to the contrary in this Agreement, Seller shall have the benefit of income and the burden of expenses for the day preceding the Closing Date and the Purchaser shall have the benefit of income and the burden of expenses for the Closing Date and thereafter. The items below will be prorated at Closing utilizing the information known at that time, and a post-closing “true-up” shall take place on or before the date that is ninety (90) days after the Closing Date (or such later date, if needed) to adjust said prorations, if necessary. Such prorated items shall include, without limitation, the following:

(1) ad valorem taxes and assessments levied against the Property for the tax year in which Closing occurs;

(2) any utility costs and other operating expenses or other items pertaining to the Property which are customarily prorated between a purchaser and a seller in the area in which the Property is located; and

(3) if applicable, annual assessments or similar periodic charges under any private covenants, conditions, restrictions or easements affecting the Property.

(b) Notwithstanding anything contained in the foregoing provisions:

(1) Any ad valorem taxes paid at or before Closing shall be prorated based upon the amounts actually paid. If taxes and assessments for the current year have not been paid before Closing, Seller shall be charged at Closing an amount equal to that portion of such taxes and assessments which relates to the period before Closing and Purchaser shall pay the taxes and assessments before their becoming delinquent. Any such apportionment made with respect to a tax year for which the tax rate or assessed valuation, or both, have not yet been fixed shall be based upon the tax rate and/or assessed valuation last fixed. To the extent that the actual taxes and assessments for the current year differ from the amount apportioned at Closing, the parties shall make all necessary adjustments by appropriate payments between themselves following Closing.

(2) If after Closing any ad valorem taxes or other assessments with respect to the Property are or become due for the year of Closing or prior years, then Seller shall pay to Purchaser, on or before the date that is ten (10) days after receipt of Purchaser’s statement of such taxes and/or assessments, (i) the full amount of such additional taxes and/or other assessments for any year before the year of Closing and (ii) Seller’s share of any such additional taxes and/or other assessments for the year of Closing, prorated in the manner set forth above; and such obligation of Seller shall not merge with the deed(s) to be delivered under this Agreement but shall survive Closing.

(c) The provisions of this Section 4.6 shall survive Closing.

**4.7 Closing Costs.**

(a) Seller shall pay (i) the fees of any counsel representing Seller in connection with this transaction, (ii) all applicable transfer taxes, documentary stamp taxes and similar charges relating to the transfer of the Property, (iii) the costs of curing all title objections for which Seller is responsible under this Agreement, and (iv) the costs of recording all mortgage cancellations, if applicable, and all recordable documents contemplated by this agreement.

(b) Purchaser shall pay (i) the fees of any counsel representing Purchaser in connection with this transaction, (ii) the premium for the Title Policy and for any lender's title policy, (iv) the cost of Purchaser's inspections of the Property, (v) the cost of the Survey, and (vi) the costs of any financing obtained by Purchaser.

(c) Except as otherwise provided in this Agreement, all other costs and expenses incident to this transaction and Closing shall be paid by the party incurring same.

**4.8 Conditions Precedent to Obligation of Purchaser.** The obligation of Purchaser to consummate the transaction under this Agreement shall be subject to the fulfillment on or before the Closing Date (or such earlier time as otherwise required by this Agreement) of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

(a) Seller shall have delivered to Purchaser all of the items required to be delivered to Purchaser by Seller or Seller's agents pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.4.

(b) All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date, as if made and updated as of the Closing Date (without any reference to "knowledge").

(c) Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the Closing Date.

(d) No moratorium shall be threatened or in effect that would impact the timing or cost of the development of the Property or Purchaser's intended use of the Property.

(e) All other conditions precedent to Purchaser's obligation to consummate the transaction under this Agreement (if any) which are set forth in this Agreement shall have been satisfied on or before the Closing Date.

If any of the foregoing conditions has not been satisfied on or before the Closing Date (or such other time as otherwise required by this Agreement) other than through failure of Purchaser to materially comply with its obligations under this Agreement, Purchaser may elect, at Purchaser's option, to (i) terminate this Agreement by written notice given to Seller on the Closing

Date, whereupon the parties shall have no further rights, duties or obligations under this Agreement, other than those that are expressly provided in this Agreement to survive the termination of this Agreement, or (ii) extend the Closing Date for up to thirty (30) days to allow for the satisfaction of any such unsatisfied condition(s); provided, however, if any such condition(s) remain unsatisfied thereafter, Purchaser may elect to terminate this Agreement by written notice given to Seller on the then-scheduled Closing Date, whereupon the parties shall have no further rights, duties or obligations under this Agreement, other than those that are expressly provided in this Agreement to survive the termination of this Agreement. Notwithstanding the foregoing, if any of the foregoing conditions has not been satisfied due to the default of Seller, then Purchaser's rights, remedies and obligations shall instead be determined in accordance with Article 6.

**4.9 Conditions Precedent to Obligation of Seller.** The obligation of Seller to consummate the transaction under this Agreement shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

(a) Purchaser shall have delivered to Seller all of the items required to be delivered to Seller by Purchaser or Purchaser's agents pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.5.

(b) All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date, as if made and updated as of the Closing Date.

If any of the foregoing conditions has not been satisfied on or before the Closing Date other than through failure of Seller to fully comply with its obligations under this Agreement, Seller shall have the right to terminate this Agreement by written notice given to Purchaser on the Closing Date, whereupon the parties shall have no further rights, duties or obligations under this Agreement, other than those which are expressly provided in this Agreement to survive the termination of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a default by Purchaser, then Seller's respective rights, remedies and obligations shall instead be determined in accordance with Article 6.

## ARTICLE 5

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**5.1 Representations and Warranties of Seller.** Seller makes, as of the Effective Date, the following representations and warranties to Purchaser, which representations and warranties shall be updated as of the Closing Date pursuant to Seller's Closing Certificate. Such representations and warranties are subject to those matters disclosed in Seller's disclosure statement as Schedule 5.1 ("*Seller's Disclosure Statement*").

(a) **Organization and Authority.** Seller has been duly organized and is validly existing and in good standing as a nonprofit corporation under the laws of the State of Florida and Seller is qualified to conduct business in the state in which the Property is located. Seller has the full right and authority to enter into this Agreement and to transfer the Property pursuant to this Agreement and to consummate or cause to be consummated the transaction contemplated in this Agreement. The person signing this Agreement on behalf of Seller is authorized to do so. Neither the execution and delivery of this Agreement nor any other documents executed and delivered, or to be executed and delivered, by Seller in connection with the transaction described in this Agreement, will violate (i) any provision of Seller's organizational documents; or (ii) any material agreements, regulations, or laws to or by which Seller is bound. This Agreement has been duly authorized, executed and delivered by Seller, and, assuming the due execution and delivery of this Agreement by Purchaser, is a valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms subject to (a) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws affecting the rights of creditors generally; and (b) the exercise of judicial discretion in accordance with general principles of equity.

(b) **Consents.** Seller has obtained all consents and permissions (if any) related to the transaction contemplated in this Agreement and required under Seller's organizational documents or any covenant, agreement, encumbrance, law or regulation by which Seller or the Property is bound.

(c) **Pending Actions.** No action, suit, arbitration, administrative or judicial proceeding, or unsatisfied order or judgment is pending or, to Seller's knowledge, threatened against Seller or the Property or which otherwise pertains to the Property or the transaction contemplated by this Agreement.

(d) **Condemnation.** Seller has received no notice of, nor to the best of Seller's knowledge is there, any pending, threatened or contemplated action by any governmental authority or agency having the power of eminent domain, which might result in any part of the Property being taken by condemnation or conveyed in lieu of condemnation or concern the widening, change of grade or limitation on the use of streets abutting the Property. Seller shall, promptly upon receiving any such notice or learning of any such contemplated or threatened action, give Purchaser written notice of such contemplated or threatened action.

(e) **No Assessments.** To Seller's knowledge, no assessments have been made against any portion of the Property which are unpaid (except ad valorem taxes for the current year, if any, that are not currently due and payable), whether or not they have become liens; and Seller shall notify Purchaser upon learning of any such assessments. Seller has not filed any pending notices of protest against real property tax assessments with respect to the Real Property, nor has Seller engaged anyone to file such a protest (other than protests which have been concluded).

(f) **Existing Agreements; Service Contracts.** There are no leases, service contracts, maintenance contracts, management agreements, occupancy agreements or other agreements or understandings relating to the Property that will be binding on Purchaser or the Property on or after the Closing Date, except for the Permitted Exceptions.

(g) **Environmental Matters**. Except as may be set forth in those environmental reports and other matters, if any, identified on Schedule 5.1(g) (collectively, the "*Environmental Reports*"), (i) Seller has received no written notice from any governmental authority, neighboring property owner or other party asserting any violation of Environmental Laws related to the Property, (ii) Seller has not commissioned any study or investigation relating to the presence or absence of Hazardous Materials on the Property, (iii) to Seller's knowledge, no areas on the Property exist where Hazardous Materials have been generated, disposed of, released or found, and no Hazardous Materials are present or have been released in a reportable quantity, where such a quantity has been established by Environmental Laws, at, on or under the Property, (iv) to Seller's knowledge, there are no areas on the Property for the storage or disposal of any Hazardous Materials, (v) Seller has no knowledge that the Property, or current or former operations on the Property, are not or have not been in compliance with Environmental Laws or that Seller has liability with respect thereto, (vi) to Seller's knowledge, neither Seller nor the Property is in violation of any Environmental Laws and there is no asbestos, PCB's or lead paint on the Property or any part of the Property, (vii) to Seller's knowledge, there are no storage tanks located on the Property, either above or below ground, or any underground pipes or lines on the Property, active or abandoned, and (viii) to Seller's knowledge, the Property previously has not been used as a landfill or as a dump for garbage or refuse. The term "*Environmental Laws*" shall mean the Resource Conservation and Recovery Act (42 U.S. § 6901 et seq.), as amended by the Hazardous and Solid Waste Amendments of 1984; the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S. § 9601 et seq.), as amended by the Superfund Amendments and Reauthorization Act of 1986; the Hazardous Materials Transportation Act (49 U.S. § 1801 et seq.); the Toxic Substance Control Act (15 U.S. § 2601 et seq.); the Clean Air Act (42 U.S. § 9402 et seq.); the Clean Water Act (33 U.S. § 1251 et seq.); the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S. § 136 et seq.); the Occupational Safety and Health Act (29 U.S. § 651 et seq.); and all other applicable federal, state and local environmental laws (including, without limitation, obligations under the common law), ordinances, orders, rules and regulations, as any of the foregoing may have been amended, supplemented or supplanted prior to the Closing, relating to regulation or control of hazardous, toxic or dangerous substances, materials or wastes (collectively, "*Hazardous Materials*"), or their handling, storage or disposal or to environmental health and safety.

(h) **Conflicts.** There is no agreement to which Seller is a party, or binding on Seller, which is in conflict with this Agreement.

(i) **Contractors and Suppliers.** All contractors, subcontractors, suppliers, architects, engineers, and others who have performed services or labor for or supplied

material to Seller with respect to the Property have been paid in full, and all liens arising from any such services, labor or materials (or claims with which the passage of time or notice or both could mature into liens) have been satisfied and released.

(j) **Permits and Legal Compliance.** Seller has not received written notice of an intention of any governmental authority to revoke any license, permit or certificate required for the development, use, operation or occupancy of the Property. Seller has not received any written notice that the Property is in violation of any zoning, building, fire, health, environmental or other law, statute, ordinance, regulation or order of any governmental or public authority applicable to the Property or any private covenants or restrictions encumbering the Property that remains uncured.

(k) **Financial Status.** Seller is solvent, has not made a general assignment for the benefit of its creditors, and has not admitted in writing its inability to pay its debts as they become due. Seller has neither filed, nor does it contemplate the filing of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or any other proceeding for the relief of debtors in general, nor has any such proceeding been instituted by or against Seller, nor is any such proceeding to Seller's knowledge threatened or contemplated. The sale of the Property will not render Seller insolvent.

(l) **OFAC.** Seller is in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (the "*Order*") and other similar requirements contained in the rules and regulations of the office of Foreign Assets Control, Department of the Treasury ("*OFAC*") and in any enabling legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "*Orders*"). Neither Seller nor any other party that directly or indirectly (a) controls Seller, or (b) has an ownership interest in Seller, is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "*Lists*"). Seller has not been determined by competent authority to be subject to the prohibitions contained in the Orders. Seller is not owned or controlled by, or acts for or on behalf of, any party on the Lists or any other party who has been determined by competent authority to be subject to the prohibitions contained in the Orders.

(m) **Property Documents.** Seller has or will deliver to Purchaser true, complete and accurate copies of all documents and information delivered pursuant to Section 3.1(b) of this Agreement.

**5.2 Survival of Seller's Representations and Warranties.** The representations and warranties of Seller set forth in Section 5.1 shall survive Closing for a period of one (1) year, unless notice setting forth a specific claim under any such representation or warranty shall be given to Seller within that period, in which case such representation or warranty shall survive until such claim is finally and fully resolved.

**5.3 Covenants of Seller.** Seller covenants with Purchaser, from the Effective Date until Closing or earlier termination of this Agreement, as follows:

(a) **Maintenance of Property.** Seller shall maintain the Property in the ordinary course of business consistent with Seller's past practices before the Effective Date, and in all events, in compliance with applicable law.

(b) **Provide Copies of Notices.** Seller shall furnish Purchaser with a copy of all written notices received by Seller from any governmental authority or other party of any violation of any law, statute, ordinance, regulation or order of any governmental or public authority relating to the Property on or before the date that is five (5) business days after Seller's receipt of such notice, but, if received by such date, in no event later than two (2) business days before the Closing Date.

(c) **Execution of New Contracts.** Seller shall not, without Purchaser's prior written consent in each instance (which consent may be withheld in Purchaser's sole discretion), enter into any contract or agreement that will be an obligation affecting the Property or binding on Purchaser after Closing.

(d) **Maintenance of Permits.** Seller shall maintain in existence all licenses, permits and approvals that are now in existence with respect to, and are required for, the development, ownership, operation or improvement of the Property, and are of a continuing nature.

(e) **Disposition of the Property and Other Matters.** For so long as this Agreement remains in force, Seller shall not:

(1) sell, assign, rent, lease, convey (absolutely or as security), grant a security interest in, or otherwise encumber or dispose of, the Property (or any interest or estate in the Property), change or request a change in the zoning classification of the Property or any development restrictions applicable to the Property, or consent to or acquiesce in any of the foregoing;

(2) list the Property with any broker or otherwise solicit or make or accept any offers to sell or exchange the Property, engage in any discussions or negotiations with any third party with respect to the sale, exchange or other disposition of the Property, or enter into any letters of intent, contracts or other agreements (whether or not binding) regarding the sale, exchange or other disposition of the Property;

(3) enter into any contract that will be an obligation affecting the Property or binding on Purchaser after Closing; or

(4) enter into any lease, license or occupancy agreement of all or any part of the Property.

(f) **Obligations before Closing.** Before Closing, Seller shall, at Seller's sole expense:

(1) remove all equipment, vehicles, trailers and debris from the Property and at Closing, Seller shall deliver possession of the Property to Purchaser free from all such items; and

(2) remove all Hazardous Materials from the Property in accordance with Environmental Laws and at Closing, Seller shall deliver possession of the Property to Purchaser free from all Hazardous Materials.

**5.4 Representations and Warranties of Purchaser.** Purchaser makes the following representations and warranties to Seller as of the Effective Date:

(a) **Organization and Authority.** Purchaser has been duly organized and is validly existing as a corporation under the laws of the State of Florida. Purchaser has the full right and authority to enter into this Agreement and to purchase the Property pursuant to this Agreement and to consummate or cause to be consummated the transaction contemplated in this Agreement. The person signing this Agreement on behalf of Purchaser is authorized to do so. Neither the execution and delivery of this Agreement, nor any other documents executed and delivered, or to be executed and delivered, by Purchaser in connection with the transaction described in this Agreement, will violate any provision of Purchaser's organizational documents or of any agreements, regulations, or laws to or by which Purchaser is bound. This Agreement has been duly authorized, executed and delivered by Purchaser, is a valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws affecting the rights of creditors generally; and (ii) the exercise of judicial discretion in accordance with general principles of equity.

(b) **Consents.** Subject to Purchaser's customary internal approval process for real estate purchases, Purchaser has obtained all consents and permissions (if any) related to the transaction contemplated in this Agreement and required under Purchaser's organizational documents or any covenant, agreement, encumbrance, law or regulation by which Purchaser is bound.

(c) **Pending Actions.** There is no action, suit, arbitration, administrative or judicial administrative proceeding, or unsatisfied order or judgment pending or, to Purchaser's actual knowledge, threatened against Purchaser or the transaction contemplated by this Agreement, which, if adversely determined, could individually or in the aggregate have a material adverse effect on Purchaser's ability to consummate the transaction contemplated in this Agreement.

(d) **OFAC.** Purchaser is in compliance with the Orders. Neither Purchaser nor any other party that directly or indirectly (a) controls Purchaser, or (b) has an ownership interest in Purchaser, is listed on the Lists; provided, however, Purchaser makes no

representation with respect to any shareholder of publicly traded securities. Purchaser has not been determined by competent authority to be subject to the prohibitions contained in the Orders. Purchaser is not owned or controlled by, or acts for or on behalf of, any party on the Lists or any other party who has been determined by competent authority to be subject to the prohibitions contained in the Orders.

**5.5 Survival of Purchaser's Representations and Warranties.** The representations and warranties of Purchaser set forth in Section 5.4 shall survive Closing for a period of one (1) year after Closing.

## ARTICLE 6

## DEFAULT

**6.1 Default by Purchaser**. If the sale of the Property as contemplated under this Agreement is not consummated due to Purchaser's default under this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such default, to terminate this Agreement. Seller waives and releases any right to (and covenants that it shall not) sue Purchaser: (i) for specific performance of this Agreement, or (ii) to recover any damages of any nature or description.

**6.2 Default by Seller.** If the sale of the Property as contemplated under this Agreement is not consummated due to Seller's default under this Agreement, then Purchaser may exercise any rights or remedies of Purchaser under this Agreement, at law or in equity. Without limitation on the foregoing, Purchaser shall have the right to seek specific performance of this Agreement, injunctive relief and other equitable remedies.

**6.3 Notice of Default; Opportunity to Cure.** Neither Seller nor Purchaser shall be deemed to be in default under this Agreement until and unless such party has been given written notice of its failure to comply with the terms of this Agreement and thereafter does not cure such failure on or before the date that is five (5) business days after receipt of such notice; provided, however, that this Section 6.3 shall not have the effect of extending the Closing Date.

## ARTICLE 7

## RISK OF LOSS

**7.1 Risk of Loss.** Until the purchase of the Property has been consummated on the Closing Date, all risk of loss of, damage to, or destruction of, the Property (whether by fire, flood, tornado or other casualty, or by the exercise of the power of eminent domain, or otherwise) shall belong to and be borne by Seller. For purposes of this Agreement, any contamination of the Property with Hazardous Materials, or release or discharge at the Property of Hazardous Materials, occurring on or after the Effective Date shall constitute a casualty.

**7.2 Casualty or Condemnation.** In the event of any damage to or destruction of the Property or any material portion of the Property or in the event of any taking or threat of taking by

condemnation (or any conveyance in lieu of condemnation) of any portion of the Property (or any interest in or rights appurtenant to the Property) by anyone having the power of eminent domain, Purchaser shall, by written notice to Seller delivered on or before the date that is ten (10) business days after receiving written notice from Seller of such event, elect to: (i) terminate this Agreement and all of Purchaser's obligations under this Agreement, whereupon this Agreement shall terminate and Purchaser and Seller shall have no further rights and obligations under this Agreement except those which expressly survive termination of this Agreement; or (ii) consummate the purchase of the Property. If Purchaser does not elect to terminate this Agreement pursuant to clause (i) of this Section 7.2, then Seller shall on the Closing Date pay to Purchaser all insurance proceeds then received by Seller and all condemnation awards and compensation then received by Seller. In addition, Seller shall transfer and assign to Purchaser, in form reasonably satisfactory to Purchaser, all rights and claims of Seller with respect to payment for damages and compensation on account of such damage, destruction or taking.

**7.3 Notice of Condemnation or Casualty.** Seller shall notify Purchaser immediately upon Seller's receiving notice of the occurrence or existence of any damage, destruction, condemnation or threat of condemnation affecting the Property and, at the same time, shall provide Purchaser with such information with respect thereto as is in Seller's possession to aid Purchaser in making, on an informed basis, the election between the alternatives provided by clauses (i) and (ii) in Section 7.2. Notwithstanding anything in this Agreement to the contrary, Purchaser shall have ten (10) business days after it receives such information from Seller within which to elect between such alternatives, and, accordingly, the Closing Date shall be postponed, if and to the extent necessary, to allow Purchaser such a ten (10) business day period in which to make the election under Section 7.2.

## ARTICLE 8

## MISCELLANEOUS

**8.1 Public Disclosure.** Before Closing, any press release or similar public announcement with respect to the transaction contemplated in this Agreement or any matters set forth in this Agreement will be made only in the form mutually approved by Purchaser and Seller. Notwithstanding anything to the contrary in this Agreement, Purchaser shall have the right to make all disclosures with regard to the transaction contemplated in this Agreement as are required under applicable law and regulation, including, without limitation, all applicable laws and regulations relating to securities, securities exchanges and the issuers of securities.

**8.2 Notices.** Any notice, demand, request or other communication (a "*notice*") required or permitted to be given under this Agreement shall be in writing and shall be delivered by hand or overnight courier (such as United Parcel Service or Federal Express), sent by electronic mail or mailed by United States registered or certified mail, return receipt requested, postage prepaid and addressed to each party at its address as set forth below. All notices delivered by hand shall be deemed given upon the date so received; those given by commercial courier as provided above shall be deemed given on the date deposited; and those given by electronic mail shall be deemed given on the date of electronic mail transmittal. Nonetheless, the time period, if any, in which a

response to any notice must be given shall commence to run from the date of receipt of the notice by the addressee of such notice. Any notice not received because of changed address or electronic mail address of which no notice was given as provided above or because of refusal to accept delivery shall be deemed received by the party to whom addressed on the date of hand delivery, on the first calendar day after deposit with commercial courier, or on the date of electronic mail transmittal, as the case may be. By giving at least five (5) days' prior written notice, any party may from time to time and at any time change its mailing address under this Agreement. Any notice of any party may be given by such party's counsel.

The parties' respective addresses for notice purposes are as follows.

| | |
|---|---|
| If to Purchaser: | The Frazer School, Inc.<br>4700 NW 89th Blvd.<br>Gainesville, FL 32606<br>Attention: Olanrewaju Fayiga<br>Email: fayigaoi@frazerschool.org |
| with a copy to: | Eversheds Sutherland (US) LLP<br>999 Peachtree Street, NE<br>Suite 2300<br>Atlanta, GA 30309<br>Attn: Rachel Reid<br>Email: RachelReid@eversheds-sutherland.com |
| If to Seller: | **[*INSERT SELLER'S CONTACT INFO]**<br>Attention:<br>Telephone: |
| with a copy to: | **[*INSERT SELLER'S COUNSEL CONTACT INFO]**<br>Attention:<br>Telephone:<br>Email: |

**8.3 Modifications.** This Agreement cannot be changed orally, and no agreement shall be effective to waive, change, modify or discharge it in whole or in part unless such agreement is (i) in writing, (ii) identified as a waiver, change, modification or discharge of this Agreement, as applicable, and (iii) is signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

**8.4 Calculation of Time Periods.** Unless otherwise specified in this Agreement, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday under the laws of the State in which the Property is located, in which event the period shall run until the end of the next business day. The final day of any such period shall be deemed to end at 6:00 p.m. (Gainesville, Florida local time). As used in this Agreement, the term "*business day*" shall be

deemed to mean any day, other than a Saturday or Sunday or a day on which commercial banks in the State of Georgia are authorized to be closed for business.

**8.5 Successors and Assigns.** The terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties to this Agreement.

**8.6 Entire Agreement.** This Agreement, including the Schedules and Exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

**8.7 Further Assurances.** Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement. Without limiting the generality of the foregoing, Purchaser shall, if requested by Seller, execute acknowledgments of receipt with respect to any materials delivered by Seller to Purchaser with respect to the Property. The provisions of this Section 8.7 shall survive Closing.

**8.8 Counterparts; Electronic Signatures Binding.** To facilitate execution of this Agreement, this Agreement may be executed in multiple counterparts, each of which, when assembled to include an original or electronic mail (in .PDF or similar file) signature for each party contemplated to sign this Agreement, will constitute a complete and fully executed agreement. All such fully executed original or electronic mail (in .PDF or similar file) counterparts will collectively constitute a single agreement, and such signatures shall be legally binding upon the party sending the signature by such electronic means immediately upon being sent by such party. Further, the parties agree that signatures by DocuSign, Sign-n-Send or other similar electronic signing software will be deemed to be originals.

**8.9 Severability.** If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

**8.10 Applicable Law.** This Agreement is performable in the state in which the Property is located and shall in all respects be governed by, and construed in accordance with, the substantive federal laws of the United States and the laws of such state. Seller and Purchaser irrevocably submit to the jurisdiction of any state or federal court sitting in the state and judicial district in which the Property is located in any action or proceeding arising out of or relating to this Agreement and irrevocably agree that all claims in respect of such action or proceeding shall be heard and determined in a state or federal court sitting in the state and judicial district in which the Property is located. Purchaser and Seller agree that the provisions of this Section 8.10 shall survive Closing of the transaction contemplated by this Agreement.

**8.11 No Third Party Beneficiary.** The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall

have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

**8.12 Exhibits and Schedules.** The following schedules or exhibits attached to this Agreement shall be deemed to be an integral part of this Agreement:

| | | |
|---|---|---|
| **Schedule A** | - | Legal Description of the Land |
| **Schedule 2.4** | - | Required Title Policy Endorsements |
| **Schedule 3.1(b)** | - | Property Documents |
| **Schedule 4.2** | - | Noteholders |
| **Schedule 4.4(a)** | - | Form of Limited Warranty Deed |
| **Schedule 4.4(b)** | - | Form of Bill of Sale and Assignment |
| **Schedule 4.4(c)** | - | Form of Seller's Closing Certificate |
| **Schedule 5.1** | - | Seller's Disclosure Statement |
| **Schedule 5.1(g)** | - | Environmental Reports |

**8.13 Captions.** The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any section or any subsection of this Agreement.

**8.14 Construction.** The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits, schedules or amendments to this Agreement.

**8.15 Termination of Agreement.** It is understood and agreed that if either Purchaser or Seller terminates this Agreement pursuant to a right of termination granted under this Agreement, such termination shall operate to relieve Seller and Purchaser (in which event the defaulting party shall remain liable as provided in this Agreement) from all obligations under this Agreement, except for such obligations as are specifically stated in this Agreement to survive the termination of this Agreement.

**8.16 Survival.** All provisions of this Agreement which are not fully performed as of Closing shall survive Closing subject to the terms and provisions set forth in Sections 5.2 and 5.5 respectively.

**8.17 Time of Essence.** Time is of the essence with respect to this Agreement.

[signatures commence on following page]

IN WITNESS WHEREOF, the parties to this Agreement have duly executed this Agreement as of the Effective Date.

**PURCHASER:**

The Frazer School, Inc.,
a Florida corporation

By: ____________________________
Name: ____________________________
Title: ____________________________

[signatures continued on the following pages]

**SELLER:**

Newberry Christian Community School, Inc.,
a Florida nonprofit corporation

By: ______________________________
Name: ____________________________
Title: ____________________________

[signatures continued on the following pages]

# SCHEDULE A

## Legal Description of Land

[*INSERT LEGAL DESCRIPTION]

# SCHEDULE 2.4

**Required Title Policy Endorsements**

**[TBD]**

1. [*Zoning – Unimproved Land – ALTA 3] ***or*** [*Zoning – Completed Structure – ALTA 3.1] ***or*** [*Zoning – Land Under Development – ALTA 3.2]
2. Commercial Environmental Protection Lien – ALTA 8.2-06
3. [*Covenants, Conditions and Restrictions – Unimproved Land – ALTA 9.1-06] ***or*** [*Covenants, Conditions and Restrictions – Improved Land – ALTA 9.2-06] ***or*** [*Covenants, Conditions and Restrictions – Land Under Development – ALTA 9.8-06]
4. Private Rights – ALTA 9.9-06
5. Access and Entry – ALTA 17-06
6. [*Single Tax Lot – ALTA 18-06] ***or*** [*Multiple Tax Parcel – ALTA 18.1-06 or 18.2-06]
7. [*Contiguity – Multiple Parcels – ALTA 19-06] ***or*** [*Contiguity – Single Parcel – ALTA 19.1-06]
8. Same as Survey – ALTA 25-06
9. Subdivision – ALTA 26
10. Policy Authentication – ALTA 39-06
11. Waiver of Arbitration
12. “Gap” Coverage

# SCHEDULE 3.1(b)

## Property Documents

1. Copies of all tax bills for the Property for the last three (3) years;

2. Copies of all environmental reports related to the Property;

3. Copies of all surveys, plats, subdivision plats, site plans and topographical maps related to the Property;

4. Copies of all soils, geological and engineering reports related to the Property;

5. Information regarding current zoning of the Property and other relevant land-use information;

6. Copies of all utility agreements and reservations related to the Property;

7. Copies of all title insurance policies and title exception documents for the Property; and

8. If applicable, copies of all leases of all or any part of the Property and other agreements relating to the use and operation of all or any part of the Property.

# SCHEDULE 4.2

## Noteholders

**SCHEDULE 4.4(a)**

**Form of Special Warranty Deed**

**When recorded, return to:**

____________________
____________________
____________________
____________________

**Tax Parcel Number: ____________________**

**LIMITED WARRANTY DEED**

THIS LIMITED WARRANTY DEED, made this ___ day of ___________, 2026, between **Newberry Christian Community School, Inc.**, a Florida nonprofit corporation ("*Grantor*"), and **The Frazer School, Inc.**, a Florida corporation ("*Grantee*"; the words "*Grantor*" and "*Grantee*" to include their respective heirs, successors and assigns where the context requires or permits);

WITNESSETH:

For and in consideration of the sum of $10.00 and other good and valuable consideration delivered to Grantor by Grantee at and before the execution, sealing and delivery hereof, the receipt and sufficiency of which are hereby acknowledged, Grantor has and hereby does grant, bargain, sell, alien, convey, and confirm unto Grantee, all that tract or parcel of land lying and being in [*Land Lot __ of the ___ Land District of Alachua County, Florida], as more particularly described on Exhibit A (the "*Land*"), subject to all matters set forth on Exhibit B (the "*Permitted Exceptions*").

TO HAVE AND TO HOLD said Land, together with any and all improvements located thereon, and any and all of the rights, members, easements, hereditaments, and appurtenances thereof to the same being, belonging or in anywise appertaining to the only proper use, benefit, and behoof of Grantee, subject to the Permitted Exceptions, forever, in FEE SIMPLE.

AND, SUBJECT TO the Permitted Exceptions, Grantor shall warrant and forever defend the right and title to said Land unto Grantee, against the claims of all persons whomsoever claiming by, through or under Grantor, but not otherwise.

[signature appears on following page]

IN WITNESS WHEREOF, Grantor has executed this Special Warranty Deed under seal as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

______________________________
Witness

______________________________
Notary Public

My Commission Expires:

______________________________
[NOTARIAL SEAL]

**GRANTOR:**

**NEWBERRY CHRISTIAN COMMUNITY SHOOL, INC., a Florida nonprofit corporation**

By: ___________________________ [SEAL]
Name: ________________________
Its: ___________________________

**Exhibits to Special Warranty Deed**

Exhibit A -- Legal Description of the Property

Exhibit B -- Permitted Exceptions

**SCHEDULE 4.4(b)**

**Form of Bill of Sale and Assignment**

**BILL OF SALE AND ASSIGNMENT**

This BILL OF SALE AND ASSIGNMENT (this "*Assignment*") is made and entered into this ____ day of _____, 2026, between Newberry Christian Community School, Inc., a Florida nonprofit corporation ("*Seller*"), and The Frazer School, Inc., a Florida corporation ("*Purchaser*").

**BACKGROUND:**

A. Seller and Purchaser entered into that certain Purchase and Sale Agreement, dated ______ ___, 2026 (as may be amended and/or assigned from time to time, the "*Contract*").

B. Concurrently with the execution and delivery of this Assignment and pursuant to the Contract, Seller is conveying to Purchaser, by Special Warranty Deed, (i) that certain tract or parcel of real property located in Alachua County, Florida, and more particularly described on Exhibit A (the "*Land*"), (ii) those rights, easements and appurtenances pertaining to the Land (the "*Related Rights*"), and (iii) the buildings, structures, fixtures and other improvements, if any, on and within the Land (the "*Improvements*"; and the Land, the Related Rights and the Improvements being sometimes collectively referred to as the "*Real Property*").

C. Seller has agreed to convey to Purchaser certain personal property as set forth in this Assignment.

**AGREEMENT:**

NOW, THEREFORE, in consideration of the receipt of Ten Dollars ($10.00), the assumptions by Purchaser set forth in this Assignment and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Seller and Purchaser agree as follows:

1. **Bill of Sale.** Seller sells, assigns, transfers and conveys to Purchaser all of Seller's right, title and interest in, to and under all governmental and non-governmental permits, licenses, consents, approvals and authorizations, if any, belonging to or inuring to the benefit of Seller and pertaining to the Real Property, to the extent that such permits, licenses, consents and approvals are assignable (collectively, the "*Intangible Property*"). Seller warrants to Purchaser that Seller has not sold, transferred, assigned, pledged, encumbered or otherwise conveyed to any third party its right, title and interest in the Intangible Property.

2. **Successors and Assigns.** This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of the parties to this Assignment.

3. **Governing Law.** This Assignment shall be construed under and enforced in accordance with the laws of the State of Florida.

[signatures commence on following page]

EXECUTED effective as of the date first above written.

**SELLER:**

**NEWBERRY CHRISTIAN COMMUNITY SHOOL, INC., a Florida nonprofit corporation**

By: ________________________
Name: ______________________
Title: ______________________

**Exhibits to Bill of Sale and Assignment**

Exhibit A -- Legal Description of the Property

**SCHEDULE 4.2(c)**

**Form of Seller's Closing Certificate**

**CERTIFICATE OF SELLER'S REPRESENTATIONS AND WARRANTIES**

THIS CERTIFICATION is made this ___ day of ___________, 2026 by Newberry Christian Community School, Inc., a Florida nonprofit corporation ("*Seller*"), in favor of and The Frazer School, Inc., a Florida corporation ("*Purchaser*").

Seller certifies that the representations and warranties of Seller set forth in Section 5.1 of that Purchase and Sale Agreement, dated ____________ ___, 2026, between Seller and Purchaser (as may be amended and/or assigned from time to time, the "*Contract*"), are (i) with respect to all such representations and warranties which are not qualified by materiality, true and correct in all material respects as of the date hereof, and (ii) with respect to all such representations and warranties which are qualified by materiality, true and correct in all respects as of the date hereof.

This certificate is delivered pursuant to Section 4.4(c) of the Agreement and shall survive for the period set forth in Section 5.2 of the Agreement.

[signature appears on following page]

**SELLER:**

**NEWBERRY CHRISTIAN COMMUNITY SHOOL, INC., a Florida nonprofit corporation**

By: ________________________
Name: ______________________
Title: ______________________

Date of Execution: ____________

**Exhibits to Seller's Closing Certificate**

Exhibit A – Disclosed Items

# SCHEDULE 5.1

## Seller's Disclosure Statement

[*To be completed by Seller; if none, insert "None"]

# SCHEDULE 5.1(g)

## Environmental Reports

[*To be completed by Seller; if none, insert "None"]

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "*Agreement*") is made as of April ___, 2026 (the "*Effective Date*"), between **The Frazer School, Inc.,** a Florida corporation ("*Purchaser*"), and **Newberry Christian Community School, Inc.,** a Florida nonprofit corporation ("*Seller*").

## BACKGROUND:

A. Seller is the owner of that certain parcel of land consisting of approximately *___ acres, located in Alachua County, Florida, and more particularly described on Schedule A (the "*Land*").

B. Seller desires to sell, and Purchaser desires to purchase, the Property (as defined below) upon and subject to the terms and conditions set forth in this Agreement.

C. Seller, as Landlord, and Purchaser, as Tenant ("*Tenant*"), are parties to that certain Lease Agreement dated May 23, 2025 (the "*Lease*"), pursuant to which Purchaser currently leases the Land and the Improvements from Seller, and the Lease is currently in full force and effect.

~~B.~~D. Seller and Purchaser are parties to that certain School Transition and Asset Purchase Agreement dated December 17, 2025 (the "*Transition Agreement*"), pursuant to which Purchaser has the option to purchase the Property on the terms and conditions set forth in the Transaction Agreement, and the Transition Agreement is currently in full force and effect.

## AGREEMENT:

NOW, THEREFORE, for and in consideration of the foregoing premises, the mutual covenants and agreements set forth in this Agreement, and other good and valuable consideration, all of which each party respectively agrees constitutes sufficient consideration received at or before the execution and delivery of this Agreement, the parties, intending to be legally bound, agree as follows:

## ARTICLE 1

## PURCHASE AND SALE

**1.1 Agreement of Purchase and Sale.** Subject to the terms and conditions set forth in this Agreement, and pursuant to the terms and conditions agreed to in the Transition Agreement, Purchaser hereby exercises its option to purchase the Property and Seller agrees to sell and convey and Purchaser agrees to purchase the following:

(a) the Land;

(b) those rights, easements and appurtenances pertaining to the Land, including (i) all right, title and interest of Seller (if any) in and to adjacent streets, alleys or rights-of-way, (ii) strips, gaps and gores, if any, in connection with the Land, (iii) any and all oil, gas and minerals lying under, in, on or about or constituting a part of the Land,

regardless of whether the minerals are considered part of the surface estate or part of the mineral estate, and (iv) all right, title and interest of Seller with respect any easements or covenants that benefit or burden the Land (collectively, the "*Related Rights*");

(c) the structures and other improvements (if any) on the Land (collectively, the "*Improvements*," and the Land, the Related Rights and the Improvements being collectively referred to as the "*Real Property*");

(d) all of Seller's right, title and interest in, to and under all governmental and non-governmental permits, licenses, consents, approvals and authorizations if any, belonging to or inuring to the benefit of Seller and pertaining to the Real Property, to the extent that such permits, licenses, consents and approvals are assignable at no cost by Seller (collectively**,** the "*Intangible Property*").

**1.2 Property Defined.** The Land, the Related Rights, the Improvements and the Intangible Property are referred to collectively as the "*Property*."

**1.3 Permitted Exceptions.** Seller shall convey the Property, and Purchaser shall accept the Property, subject to the matters which are, or are deemed to be, Permitted Exceptions pursuant to Article 2 (collectively, the "*Permitted Exceptions*").

**1.4 Purchase Price.** Seller is to sell and Purchaser is to purchase the Property for a total purchase price of **Thirteen Million Five Hundred Three Thousand Eighty-Four and 70/100 Dollars ($13,503~~0~~,084~~00~~.~~0~~70)** (the "*Purchase Price*").

~~1.4~~ **1.5 Earnest Money.** Within five (5) days following the Effective Date, Purchaser shall deposit with the Closing Agent (as defined below), the sum of One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) as earnest money (the "*Earnest Money*"). Upon the expiration of the Inspection Period (as defined below), the Earnest Money shall be (i) deemed non-refundable except in the event of an uncured Seller default or failure of a condition precedent to Closing and (ii) applied to and credited toward the Purchase Price at Closing, or paid to Seller as liquidated damages as hereinafter provided, all as more fully set forth within this Agreement.

~~1.5~~ **1.6 Payment of Purchase Price.** The Parties expressly acknowledge and agree that (a) the Purchase Price shall be funded through loan proceeds arranged by Purchaser and complete satisfaction and release of that certain obligation owing from Seller to Purchaser in the amount of $5,119,262.85 (referred to in the Transition Agreement and this Agreement as the "Equity Credit"), ~~(b) Seller shall receive no cash proceeds from the sale of the Property~~ and (be) at Closing (as defined below), all funds~~loan proceeds~~ shall be disbursed by the Closing Agent solely in accordance with the priority disbursement schedule set forth in Section 4.2.

## ARTICLE 2

## TITLE AND SURVEY

**2.1 Title Examination; Commitment for Title Insurance.** Purchaser shall have Seller's title to the Property examined. The report of such title examination shall be in the form of an

owner's title insurance commitment (as initially issued to Purchaser, the "*Title Commitment*") issued by the title insurer.

**2.2 Survey.** On or before the date that is ten (10) days prior to the Inspection Date, Purchaser may, at Purchaser's expense, have the Real Property accurately surveyed by a licensed surveyor or engineer of Purchaser's choice showing the actual boundaries of the Real Property, the acreage contained in the Land, the location of the Improvements and such other matters as Purchaser deems appropriate. Such survey shall constitute the "*Survey*." For purposes of the Deed (as defined below) to be delivered to Purchaser at Closing, the legal description of the Real Property shall be the legal description attached as Schedule A or such other legal description by which Seller acquired title to the Property, as elected by Purchaser. If, however, the metes and bounds description drawn from the Survey reflects a legal description different from the legal description attached as Schedule A, at Closing, Seller shall also deliver to Purchaser a quitclaim deed, in form and content reasonably satisfactory to Purchaser and Seller, containing the legal description drawn from the Survey.

**2.3 Title Objections; Cure of Title Objections.**

(a) Purchaser shall have until the date that is ten (10) days prior to the Inspection Date to notify Seller, in writing, of such objections as Purchaser may have to the Title Commitment (including the title exception documents referred to in the Title Commitment) or the Survey, other than the Permitted Exceptions described in clauses (a) and (b) of Section 2.4. Any item contained in the Title Commitment or shown on the Survey to which Purchaser does not object on or before the Inspection Date shall be deemed a "*Permitted Exception*."

(b) If Purchaser shall notify Seller of objections to title or matters shown on the Survey on or before the Inspection Date, Seller shall have the right, but not the obligation, to cure such objections. On or before the fifth (5th) business day from and after Seller's receipt of Purchaser's notice of objections, Seller shall notify Purchaser in writing whether Seller elects to attempt to cure such objections. Seller's failure to provide such a notice shall be deemed an election by Seller not to cure any such objection. If Seller elects to attempt to cure, and provided that Purchaser shall not have terminated this Agreement in accordance with Section 3.2 hereof, then Seller shall be obligated to cure such objection or objections. If Seller elects, or is deemed to have elected, not to cure any objections specified in Purchaser's notice, then in either such case Purchaser shall have the right to elect one, but not both, of the following options, which election must in each case be made within the time period provided in paragraph (c) below:

(1) to accept a conveyance of the Property subject to the Permitted Exceptions, specifically including any matter objected to by Purchaser which Seller is unwilling or unable to cure, and without reduction of the Purchase Price; or

(2) to terminate this Agreement by sending written notice of such termination to Seller, and upon delivery of such notice of termination, this

Agreement shall terminate, and thereafter neither party to this Agreement shall have any further rights, obligations or liabilities under this Agreement except to the extent that any right, obligation or liability set forth in this Agreement expressly survives termination of this Agreement.

(c) If Seller notifies Purchaser that Seller does not intend to attempt to cure any title objection, or if Seller is deemed to have elected not to cure any title objections, then in any such case Purchaser shall, on or before the date that is five (5) business days after receiving Seller's notice or the date of Seller's deemed election, as applicable, notify Seller in writing whether Purchaser shall elect to accept the conveyance under clause (b)(1) above or to terminate this Agreement under clause (b)(2) above. Purchaser's failure to provide such a notice will be deemed an election by Purchaser to accept conveyance under clause (b)(1) above.

(d) Notwithstanding anything contained in this Agreement to the contrary, Seller shall be obligated at Closing to discharge all mortgages and other monetary liens encumbering the Property (regardless of whether Purchaser objects to such mortgage or monetary lien) which were created by Seller. To the extent available, Seller shall use any net proceeds that would otherwise be payable to Seller at Closing to satisfy such encumbrances. (The term "*mortgage*" as used in this Agreement includes any mortgage, deed of trust, deed to secure debt and similar security instrument securing an indebtedness of Seller and encumbering the Property or any portion of the Property; the terms "*discharge*" and "*discharged*" as used in this Agreement include compliance with a statutory bonding procedure that has the legal effect of removing the mortgage or other item as a lien on the Property).

**2.4 Conveyance of Title.** At Closing, Seller shall convey and transfer the Property to Purchaser. It shall be a condition to Purchaser's obligation to close this transaction that the title company shall have issued the Title Policy to Purchaser (or unconditionally committed to issue the Title Policy to Purchaser upon receipt of the title insurance premium for such Title Policy). **"***Title Policy***"** means an extended coverage American Land Title Association (ALTA) Form 2021 Owner's Policy of Title Insurance (or such other comparable form of title insurance policy as is available in the jurisdictions in which the Real Property is located) insuring Purchaser's fee simple title to the Real Property, in the full amount of the Purchase Price with the standard exceptions deleted, subject only to the following matters, which shall be deemed to be Permitted Exceptions, and including the endorsements set forth in Schedule 2.4:

(a) the lien of all ad valorem real estate taxes and assessments not yet due and payable as of the Closing Date (as defined below), subject to proration and adjustment as provided in this Agreement;

(b) local, state and federal laws, ordinances or governmental regulations, including but not limited to, building, zoning and land use laws, ordinances and regulations, now or hereafter in effect relating to the Property;

(c) additional items, if any, appearing of record or shown on the Survey, approved or deemed approved by Purchaser pursuant to Section 2.3 or 2.5 hereof; and

(d) additional items, if any, approved by Purchaser pursuant to Section 5.3(e) hereof.

**2.5 Pre-Closing "Gap" Title Defects.** Whether or not Purchaser shall have furnished to Seller any notice of title objections pursuant to the foregoing provisions, Purchaser may, at or before Closing, notify Seller in writing of any objections to title first raised by the title company or the surveyor after the effective date of the Title Commitment or Survey, as appropriate; provided, however, that Purchaser must notify Seller of any such objections on or before the date that is ~~ten~~three (3~~10~~) business days after Purchaser's first receipt of the updated title commitment or updated survey, whichever first provides notice of the condition giving rise to any such objection. With respect to any objections to title set forth in such notice, Seller shall have the same option to cure and Purchaser shall have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any notice of objections made by Purchaser on or before the Inspection Date.

**ARTICLE 3**

**INSPECTION PERIOD**

**3.1 Right of Inspection.**

(a) Beginning upon the Effective Date and continuing thereafter so long as this Agreement remains in full force and effect, Purchaser shall have the right to physically inspect the Property, and Purchaser, personally or through agents, employees or contractors, may go upon the Property during normal business hours or at other reasonable times agreed to in advance by Seller to make boundary line or topographical surveys and to conduct such studies, tests, samplings, investigations and analyses of any and all aspects of the Property as Purchaser deems desirable, including, without limitation, engineering, environmental, soil, and groundwater and other tests, samplings, investigations and studies of the Property.

(b) In addition to any other obligation to assist Purchaser in the inspection of the Property, Seller agrees to deliver to Purchaser, on or before the date that is five (5) days after the Effective Date, true and correct copies of all materials described on Schedule 3.1(b) (collectively, the "*Property Documents*"), to the extent such items are in the possession or control of Seller and to the extent Seller has not already done so. Seller does not represent the accuracy of any of the Property Documents. The failure or delay of Seller to provide any of the Property Documents shall not cause the Inspection Period to be extended.

**3.2 Right of Termination.** Seller agrees that if Purchaser determines, in Purchaser's sole discretion, that it does not wish to acquire the Property for any reason or no reason, then Purchaser shall have the right to terminate this Agreement by giving written notice of such termination to Seller on or before ~~__________~~ ~~__~~May 18, 2026 (the "*Inspection Date*"). Upon any such termination of this Agreement pursuant to Purchaser's rights under this Section 3.2, Purchaser and Seller shall have no further rights and obligations under this Agreement except those which expressly survive termination of this Agreement. The period commencing on the Effective Date and ending on the Inspection Date is sometimes referred to in this Agreement as the "*Inspection Period*."

## ARTICLE 4

## CLOSING

**4.1 Time and Place.** The consummation of the transaction contemplated by this Agreement ("*Closing*") shall be ~~held~~conducted by mail or electronic means~~ at the offices of _________________ at ___:00 _.m. (Gainesville, Florida local time)~~ on or before ~~____________ __~~June 17, 2026 (or such extended date as may be provided under other provisions of this Agreement). The Parties shall designate a mutually acceptable licensed title company or closing attorney located in Florida, to serve as the closing agent ("*Closing Agent*") [Seller proposes David Menet with Salter Feiber, P.A. He acted as title and closing agent for the purchase last year]. At Closing, Seller and Purchaser shall perform the obligations set forth in Section 4.4 and Section 4.5, respectively. Closing may be held at such other place or such earlier time and date as Seller and Purchaser shall mutually approve in writing. The date on which Closing is scheduled to occur under this Agreement (or, if earlier, the date on which Closing occurs) is referred to in this Agreement as the "*Closing Date*." ~~Purchaser shall have the right to extend the Closing Date by two (2) periods of thirty (30) days each by providing Seller with written notice of such extension at least three (3) days before the then-scheduled Closing Date.~~

**4.2 Disbursement by Closing Agent.** At Closing, the Closing Agent shall disburse all ~~loan proceeds~~funds in the following strict priority order, without deviation, and Seller and Purchaser hereby irrevocably authorizes and directs the Closing Agent to make such disbursements:

| ~~Priority~~ | ~~Payee / Purpose~~ | ~~Approximate Amount~~ |
|---|---|---|
| ~~**(1)**~~ | ~~**Renasant Bank** / Restricted Reserve Account~~ | ~~$2,250,000.00~~ |
| ~~**(2)**~~ | ~~**Capital City Bank** / existing mortgage payoff~~ | ~~~$4,100,000.00~~ |
| ~~**(3)**~~ | ~~**Joiner Construction and other holders of outstanding construction and renovation liens** / satisfaction of all outstanding construction/renovation liens~~ | ~~~$3,500,000.00~~ |
| ~~**(4)**~~ | ~~**The Frazer School, Inc.** / payment of principal IRS payroll tax liability~~ | ~~~$580,000.00~~ |
| ~~**(5)**~~ | ~~**The Frazer School, Inc.** / payment of outstanding vendor~~ | ~~~$404,000.00~~ |

| | | |
|---|---|---|
| | ~~accounts payable, including approximately $200,000 to architect and remaining vendor obligations~~ | |
| ~~(6)~~ | ~~**Holders of outstanding promissory notes listed on Schedule 4.2** / principal reduction and accrued interest payments~~ | ~~~$1,900,000.00~~ |
| ~~(7)~~ | ~~**The Frazer School, Inc.** / unrestricted working capital~~ | ~~~$750,000.00 (or remaining balance)~~ |

| Priority | Payee / Purpose | Approximate Amount |
|---|---|---|
| **(1)** | **Capital City Bank** / existing mortgage payoff, plus additional amounts required by Capital City Bank | ~$5,100,000.00 |
| **(2)** | **Joiner Construction and other holders of outstanding construction and renovation liens** / satisfaction of all outstanding construction/renovation liens | ~$3,500,000.00 |
| **(3)** | **Newberry Christian Community School, Inc.** / Seller's net proceeds | ~$(remaining balance) |
| | | |

**4.3 Final Disbursement Schedule.** The Parties acknowledge that the amounts set forth in Section 4.2 are approximate. The Closing Agent shall prepare a final, itemized Closing disclosure and disbursement schedule no fewer than three (3) business days prior to the Closing Date, reflecting exact payoff amounts, lien releases, and final loan proceeds. The Parties shall review and approve the final disbursement schedule prepared in accordance with this Agreement prior to Closing.

**4.4 Seller's Obligations at Closing.** At Closing, Seller shall:

(a) deliver to Purchaser a special warranty deed in the form attached as Schedule 4.4(a), duly executed by Seller, pursuant to which Seller shall convey the Real Property to Purchaser subject only to the Permitted Exceptions (the "*Deed*");

(b) deliver to Purchaser a blanket bill of sale and assignment, in the form attached as Schedule 4.4(b), duly executed by Seller, pursuant to which Seller shall convey the Intangible Property to Purchaser (the "*Bill of Sale and Assignment*");

(c) deliver to Purchaser a certificate ("*Seller's Closing Certificate*"), dated as of the Closing Date and duly executed by Seller, in the form of attached as Schedule 4.4(c), stating that the representations and warranties of Seller contained in Section 5.1 are true and correct in all material respects as of the Closing Date;

(d) deliver to Purchaser such evidence as Purchaser's counsel and/or the title company may reasonably require as to the authority of the person or persons executing documents on behalf of Seller;

(e) deliver to Purchaser an affidavit duly executed by Seller stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act;

(f) deliver to the title company a reasonable and customary title insurance affidavit, duly executed by Seller or a representative of Seller, in form and content reasonably satisfactory to Purchaser and the title company and sufficient for the title company to issue the Title Policy (as defined below);

(g) deliver to Purchaser such certificate or affidavit, if any, as is required under applicable provisions of Florida law and regulation, to assure Purchaser that Florida tax withholding is not required. If Seller fails to deliver such certificate or affidavit, and otherwise fails to provide Purchaser reasonably satisfactory assurance that withholding is not required, then Purchaser shall be entitled to withhold applicable Florida taxes if and to the extent required by applicable Florida law and regulation;

(h) deliver such additional documents as shall be reasonably requested by the title company or Purchaser or required to consummate the transaction contemplated by this Agreement, provided, however, that in no event shall Seller be required to undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion;

(i) if the legal description attached as Schedule A differs from the legal description of the Property drawn from the Survey, then Seller shall at Closing deliver (in addition to the Deed) a quitclaim deed, in form and content reasonably satisfactory to Purchaser and Seller, conveying the Real Property pursuant to the legal description drawn from the Survey; and

~~(j) deliver broker's lien waivers in form and content reasonably satisfactory to Purchaser and the title company; and~~

~~(k)~~(j) deliver to Purchaser possession and occupancy of the Property, subject only to the Permitted Exceptions and the possessory rights of Tenant under the Lease.

**4.5 Purchaser's Obligations at Closing.** At Closing, Purchaser shall:

(a) deliver to Seller such evidence as Seller's counsel and/or the title company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser;

(b) deliver such additional documents as shall be reasonably requested by the title company or Seller or required to consummate the transaction contemplated by this Agreement, provided, however, that in no event shall Purchaser be required to undertake any other material liability not expressly contemplated in this Agreement, unless Purchaser elects to do so in its sole discretion.

(c) deliver to Seller such evidence as Seller's counsel may reasonably require to confirm satisfaction of Purchaser's obligations under the Transition Agreement, including, but not limited to, payment of all mortgage payments to Capital City Bank for all months of 2026 up to and including the month of Closing, payment of all Tenant's share of utilities and upkeep, payment of Purchaser's obligation for IRS payroll taxes, and payment of the accounts payable;

~~(b)~~(d) deliver to Seller such evidence as Seller's counsel may reasonably require to confirm satisfaction of Purchaser's obligations as Tenant under the Lease and to confirm that there are no existing or continuing breaches or defaults by Seller or Purchaser under the Lease, including, but not limited to, an estoppel certificate with respect to the Lease.

**4.6 Credits and Prorations.**

(a) All income and expenses in connection with the operation of the Property shall be apportioned, as of 12:01 A.M., on the Closing Date, as if Purchaser were vested with title to the Property during the entire Closing Date, such that, except as otherwise expressly provided to the contrary in this Agreement, Seller shall have the benefit of income and the burden of expenses for the day preceding the Closing Date and the Purchaser shall have the benefit of income and the burden of expenses for the Closing Date and thereafter. The items below will be prorated at Closing utilizing the information known at that time, and a post-closing "true-up" shall take place on or before the date that is ninety (90) days after the Closing Date (or such later date, if needed) to adjust said prorations, if necessary. Such prorated items shall include, without limitation, the following:

(1) ad valorem taxes and assessments levied against the Property for the tax year in which Closing occurs;

(2) any utility costs and other operating expenses or other items pertaining to the Property which are customarily prorated between a purchaser and a seller in the area in which the Property is located; and

(3) if applicable, annual assessments or similar periodic charges under any private covenants, conditions, restrictions or easements affecting the Property.

(b) Notwithstanding anything contained in the foregoing provisions:

(1) Any ad valorem taxes paid at or before Closing shall be prorated based upon the amounts actually paid. If taxes and assessments for the current year have not been paid before Closing, Seller shall be charged at Closing an amount equal to that portion of such taxes and assessments which relates to the period before Closing and Purchaser shall pay the taxes and assessments before their becoming delinquent. Any such apportionment made with respect to a tax year for which the tax rate or assessed valuation, or both, have not yet been fixed shall be based upon the tax rate and/or assessed valuation last fixed. To the extent that the

actual taxes and assessments for the current year differ from the amount apportioned at Closing, the parties shall make all necessary adjustments by appropriate payments between themselves following Closing.

(2) If after Closing any ad valorem taxes or other assessments with respect to the Property are or become due for the year of Closing or prior years, then Seller shall pay to Purchaser, on or before the date that is ten (10) days after receipt of Purchaser's statement of such taxes and/or assessments, (i) the full amount of such additional taxes and/or other assessments for any year before the year of Closing and (ii) Seller's share of any such additional taxes and/or other assessments for the year of Closing, prorated in the manner set forth above; and such obligation of Seller shall not merge with the deed(s) to be delivered under this Agreement but shall survive Closing.

(c) The provisions of this Section 4.6 shall survive Closing.

**4.7 Closing Costs.**

(a) Seller shall pay (i) the fees of any counsel representing Seller in connection with this transaction, (ii) all applicable transfer taxes, documentary stamp taxes and similar charges relating to the transfer of the Property, (iii) the costs of curing all title objections for which Seller is responsible under this Agreement, ~~and~~ (iv) the costs of recording all mortgage cancellations, if applicable, and all recordable documents contemplated by this agreement, and (v) one half of any escrow closing fee charged by the Closing Agent.

(b) Purchaser shall pay (i) the fees of any counsel representing Purchaser in connection with this transaction, (ii) the premium for the Title Policy and for any lender's title policy, (iv) the cost of Purchaser's inspections of the Property, (v) the cost of the Survey, ~~and~~ (vi) the costs of any financing obtained by Purchaser, and (v) one half of any escrow closing fee charged by the Closing Agent.

(c) Except as otherwise provided in this Agreement, all other costs and expenses incident to this transaction and Closing shall be paid by the party incurring same.

**4.8 Conditions Precedent to Obligation of Purchaser.** The obligation of Purchaser to consummate the transaction under this Agreement shall be subject to the fulfillment on or before the Closing Date (or such earlier time as otherwise required by this Agreement) of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

(a) Seller shall have delivered to Purchaser all of the items required to be delivered to Purchaser by Seller or Seller's agents pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.4.

(b) All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date, as if made and updated as of the Closing Date ~~(without any reference to "knowledge")~~.

(c) Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the Closing Date.

~~(d) No moratorium shall be threatened or in effect that would impact the timing or cost of the development of the Property or Purchaser's intended use of the Property.~~

~~(e)~~(d) All other conditions precedent to Purchaser's obligation to consummate the transaction under this Agreement (if any) which are set forth in this Agreement shall have been satisfied on or before the Closing Date.

If any of the foregoing conditions has not been satisfied on or before the Closing Date (or such other time as otherwise required by this Agreement) other than through failure of Purchaser to fully~~materially~~ comply with its obligations under this Agreement, Purchaser may elect, at Purchaser's option, to (i) terminate this Agreement by written notice given to Seller on the Closing Date, whereupon the parties shall have no further rights, duties or obligations under this Agreement, other than those that are expressly provided in this Agreement to survive the termination of this Agreement, or (ii) extend the Closing Date for up to thirty (30) days to allow for the satisfaction of any such unsatisfied condition(s); provided, however, if any such condition(s) remain unsatisfied thereafter, Purchaser may elect to terminate this Agreement by written notice given to Seller on the then-scheduled Closing Date, whereupon the parties shall have no further rights, duties or obligations under this Agreement, other than those that are expressly provided in this Agreement to survive the termination of this Agreement. Notwithstanding the foregoing, if any of the foregoing conditions has not been satisfied due to the default of Seller, then Purchaser's rights, remedies and obligations shall instead be determined in accordance with Article 6.

**4.9 Conditions Precedent to Obligation of Seller.** The obligation of Seller to consummate the transaction under this Agreement shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

(a) Purchaser shall have delivered to Seller all of the items required to be delivered to Seller by Purchaser or Purchaser's agents pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.5.

(b) All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date, as if made and updated as of the Closing Date.

~~(b)~~(c) All other conditions precedent to Seller's obligation to consummate the transaction under this Agreement (if any) which are set forth in this Agreement shall have been satisfied on or before the Closing Date.

If any of the foregoing conditions has not been satisfied on or before the Closing Date (or such other time as otherwise required by this Agreement) other than through failure of Seller to fully comply with its obligations under this Agreement, Seller shall have the

right to terminate this Agreement by written notice given to Purchaser on the Closing Date, whereupon the parties shall have no further rights, duties or obligations under this Agreement, other than those which are expressly provided in this Agreement to survive the termination of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a default by Purchaser, then Seller's respective rights, remedies and obligations shall instead be determined in accordance with Article 6.

## ARTICLE 5

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**5.1 Representations and Warranties of Seller.** Seller makes, as of the Effective Date, the following representations and warranties to Purchaser, which representations and warranties shall be updated as of the Closing Date pursuant to Seller's Closing Certificate. Such representations and warranties are subject to those matters disclosed in Seller's disclosure statement as Schedule 5.1 ("*Seller's Disclosure Statement*").

(a) **Organization and Authority.** Seller has been duly organized and is validly existing and in good standing as a nonprofit corporation under the laws of the State of Florida and Seller is qualified to conduct business in the state in which the Property is located. Seller has the full right and authority to enter into this Agreement and to transfer the Property pursuant to this Agreement and to consummate or cause to be consummated the transaction contemplated in this Agreement. The person signing this Agreement on behalf of Seller is authorized to do so. Neither the execution and delivery of this Agreement nor any other documents executed and delivered, or to be executed and delivered, by Seller in connection with the transaction described in this Agreement, will violate (i) any provision of Seller's organizational documents; or (ii) any material agreements, regulations, or laws to or by which Seller is bound. This Agreement has been duly authorized, executed and delivered by Seller, and, assuming the due execution and delivery of this Agreement by Purchaser, is a valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms subject to (a) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws affecting the rights of creditors generally; and (b) the exercise of judicial discretion in accordance with general principles of equity.

(b) **Consents.** Seller has obtained all consents and permissions (if any) related to the transaction contemplated in this Agreement and required under Seller's organizational documents or any covenant, agreement, encumbrance, law or regulation by which Seller or the Property is bound.

(c) **Pending Actions.** Except as set forth on Schedule 5.1(c), ~~N~~no action, suit, arbitration, administrative or judicial proceeding, or unsatisfied order or judgment is pending or, to Seller's knowledge, threatened against Seller or the Property or which otherwise pertains to the Property or the transaction contemplated by this Agreement.

(d) **Condemnation.** Seller has received no notice of, nor to the best of Seller's knowledge is there, any pending, threatened or contemplated action by any governmental authority or agency having the power of eminent domain, which might result in any part of the Property being taken by condemnation or conveyed in lieu of condemnation or concern the widening, change of grade or limitation on the use of streets abutting the Property. Seller shall, promptly upon receiving any such notice or learning of any such contemplated or threatened action, give Purchaser written notice of such contemplated or threatened action.

(e) **No Assessments.** To Seller's knowledge, no assessments have been made against any portion of the Property which are unpaid (except ad valorem taxes for the current year, if any, that are not currently due and payable), whether or not they have become liens; and Seller shall notify Purchaser upon learning of any such assessments. Seller has not filed any pending notices of protest against real property tax assessments with respect to the Real Property, nor has Seller engaged anyone to file such a protest (other than protests which have been concluded).

(f) **Existing Agreements; Service Contracts.** Except as set forth on Schedule 5.1(f), ~~T~~there are no leases, service contracts, maintenance contracts, management agreements, occupancy agreements or other agreements or understandings relating to the Property that will be binding on Purchaser or the Property on or after the Closing Date, except for the Permitted Exceptions.

(g) **Environmental Matters**. Except as may be set forth in those environmental reports and other matters, if any, identified on Schedule 5.1(g) (collectively, the "*Environmental Reports*"), (i) Seller has received no written notice from any governmental authority, neighboring property owner or other party asserting any violation of Environmental Laws related to the Property, (ii) Seller has not commissioned any study or investigation relating to the presence or absence of Hazardous Materials on the Property, (iii) to Seller's knowledge, no areas on the Property exist where Hazardous Materials have been generated, disposed of, released or found, and no Hazardous Materials are present or have been released in a reportable quantity, where such a quantity has been established by Environmental Laws, at, on or under the Property, (iv) to Seller's knowledge, there are no areas on the Property for the storage or disposal of any Hazardous Materials, (v) Seller has no knowledge that the Property, or current or former operations on the Property, are not or have not been in compliance with Environmental Laws or that Seller has liability with respect thereto, (vi) to Seller's knowledge, neither Seller nor the Property is in violation of any Environmental Laws and there is no asbestos, PCB's or lead paint on the Property or any part of the Property, (vii) to Seller's knowledge, there are no storage tanks located on the Property, either above or below ground, or any underground pipes or lines on the Property, active or abandoned, and (viii) to Seller's knowledge, the Property previously has not been used as a landfill or as a dump for garbage or refuse. The term "*Environmental Laws*" shall mean the Resource Conservation and Recovery Act (42 U.S. § 6901 et seq.), as amended by the Hazardous and Solid Waste Amendments of 1984; the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S. § 9601 et seq.), as amended by the Superfund

Amendments and Reauthorization Act of 1986; the Hazardous Materials Transportation Act (49 U.S. § 1801 et seq.); the Toxic Substance Control Act (15 U.S. § 2601 et seq.); the Clean Air Act (42 U.S. § 9402 et seq.); the Clean Water Act (33 U.S. § 1251 et seq.); the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S. § 136 et seq.); the Occupational Safety and Health Act (29 U.S. § 651 et seq.); and all other applicable federal, state and local environmental laws (including, without limitation, obligations under the common law), ordinances, orders, rules and regulations, as any of the foregoing may have been amended, supplemented or supplanted prior to the Closing, relating to regulation or control of hazardous, toxic or dangerous substances, materials or wastes (collectively, "*Hazardous Materials*"), or their handling, storage or disposal or to environmental health and safety.

(h) **Conflicts.** There is no agreement to which Seller is a party, or binding on Seller, which is in conflict with this Agreement. [NTD: AS CURRENTLY DRAFTED, THIS AGREEMENT CONFLICTS WITH THE TRANSITION AGREEMENT]

(i) **Contractors and Suppliers.** All contractors, subcontractors, suppliers, architects, engineers, and others who have performed services or labor for or supplied material to Seller with respect to the Property have been paid in full, and all liens arising from any such services, labor or materials (or claims with which the passage of time or notice or both could mature into liens) have been satisfied and released. [NTD: THIS IS NOT CURRENTLY TRUE – JOINER, PATEL, ARCHITECT REFERENCED BY FIELDMAN, ANY OTHERS?]

(j) **Permits and Legal Compliance.** Seller has not received written notice of an intention of any governmental authority to revoke any license, permit or certificate required for the development, use, operation or occupancy of the Property by Seller. Seller has not received any written notice that the Property is in violation of any zoning, building, fire, health, environmental or other law, statute, ordinance, regulation or order of any governmental or public authority applicable to the Property or any private covenants or restrictions encumbering the Property that remains uncured.

(k) **Financial Status.** Seller is solvent, has not made a general assignment for the benefit of its creditors, and has not admitted in writing its inability to pay its debts as they become due. Seller has neither filed, nor does it contemplate the filing of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or any other proceeding for the relief of debtors in general, nor has any such proceeding been instituted by or against Seller, nor is any such proceeding to Seller's knowledge threatened or contemplated. The sale of the Property will not render Seller insolvent.

(l) **OFAC.** Seller is in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (the "*Order*") and other similar requirements contained in the rules and regulations of the office of Foreign Assets Control, Department of the Treasury ("*OFAC*") and in any enabling legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "*Orders*"). Neither Seller nor

any other party that directly or indirectly (a) controls Seller, or (b) has an ownership interest in Seller, is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "*Lists*"). Seller has not been determined by competent authority to be subject to the prohibitions contained in the Orders. Seller is not owned or controlled by, or acts for or on behalf of, any party on the Lists or any other party who has been determined by competent authority to be subject to the prohibitions contained in the Orders.

(m) **Property Documents.** Seller has or will deliver to Purchaser true, complete and accurate copies of all documents and information in Seller's possession delivered pursuant to Section 3.1(b) of this Agreement

(n) **No Other Representations or Warranties**. Except as otherwise expressly provided in this Agreement, Seller makes no representations or warranties of any kind pertaining to the Property. In the event of Closing, the Property is being sold and accepted by Purchaser in **"AS IS"**, **"WHERE IS"** condition, except as expressly set forth in this Agreement or in documents to be delivered at Closing pursuant to the terms of this Agreement. Except for the warranties and representations made by Seller in this Agreement or in documents to be delivered at Closing pursuant to this Agreement, Seller expressly disclaims any and all warranties, express or implied, relating in any way to the nature, quality, condition, use or history of the Property.

~~(m)~~(o) **Seller's Knowledge.** All representations and warranties made to Seller's knowledge in this Agreement are made based on the actual knowledge of JAMES R. SCHRADER, without any duty to review or investigate, the matters to which such knowledge, or the absence thereof, pertains and with no imputed knowledge whatsoever, whether from any partner, officer, director, member, shareholder, or employee of Seller. JAMES R. SCHRADER shall have no personal liability arising out of any representations or warranties made herein.

**5.2 Survival of Seller's Representations and Warranties.** The representations and warranties of Seller set forth in Section 5.1 shall survive Closing for a period of one (1) year, unless notice setting forth a specific claim under any such representation or warranty shall be given to Seller within that period, in which case such representation or warranty shall survive until such claim is finally and fully resolved.

**5.3 Covenants of Seller.** Seller covenants with Purchaser, from the Effective Date until Closing or earlier termination of this Agreement, as follows:

(a) **Maintenance of Property.** Seller shall maintain the Property in the ordinary course of business consistent with Seller's past practices before the Effective Date, and in all events, in compliance with applicable law and the Lease.

(b) **Provide Copies of Notices.** Seller shall furnish Purchaser with a copy of all written notices received by Seller from any governmental authority or other party of any violation of any law, statute, ordinance, regulation or order of any governmental or public authority relating to the Property on or before the date that is five (5) business days after Seller's receipt of such notice, but, if received by such date, in no event later than two (2) business days before the Closing Date.

(c) **Execution of New Contracts.** Seller shall not, without Purchaser's prior written consent in each instance (which consent may be withheld in Purchaser's sole discretion), enter into any contract or agreement that will be an obligation affecting the Property or binding on Purchaser after Closing.

(d) **Maintenance of Permits.** Seller shall maintain in existence all of Seller's licenses, permits and approvals that are now in existence with respect to, and are required for, the ~~development,~~ ownership~~,~~ or operation ~~or improvement~~ of the Property by Seller, and are of a continuing nature.

(e) **Disposition of the Property and Other Matters.** For so long as this Agreement remains in force, Seller shall not:

(1) sell, assign, rent, lease, convey (absolutely or as security), grant a security interest in, or otherwise encumber or dispose of, the Property (or any interest or estate in the Property), change or request a change in the zoning classification of the Property or any development restrictions applicable to the Property, or consent to or acquiesce in any of the foregoing;

~~(2) list the Property with any broker or otherwise solicit or make or accept any offers to sell or exchange the Property, engage in any discussions or negotiations with any third party with respect to the sale, exchange or other disposition of the Property, or enter into any letters of intent, contracts or other agreements (whether or not binding) regarding the sale, exchange or other disposition of the Property;~~

~~(3)~~(2) enter into any contract that will be an obligation affecting the Property or binding on Purchaser after Closing; or

~~(4)~~(3) enter into any new lease, license or occupancy agreement of all or any part of the Property.

~~(f) **Obligations before Closing.** Before Closing, Seller shall, at Seller's sole expense:~~

~~(1) remove all equipment, vehicles, trailers and debris from the Property and at Closing, Seller shall deliver possession of the Property to Purchaser free from all such items; and~~

(2) remove all Hazardous Materials from the Property in accordance with Environmental Laws and at Closing, Seller shall deliver possession of the Property to Purchaser free from all Hazardous Materials.

**5.4 Representations and Warranties of Purchaser.** Purchaser makes the following representations and warranties to Seller as of the Effective Date, which representations and warranties shall be updated as of the Closing Date pursuant to Buyer's Closing Certificate:

(a) **Organization and Authority.** Purchaser has been duly organized and is validly existing as a corporation under the laws of the State of Florida. Purchaser has the full right and authority to enter into this Agreement and to purchase the Property pursuant to this Agreement and to consummate or cause to be consummated the transaction contemplated in this Agreement. The person signing this Agreement on behalf of Purchaser is authorized to do so. Neither the execution and delivery of this Agreement, nor any other documents executed and delivered, or to be executed and delivered, by Purchaser in connection with the transaction described in this Agreement, will violate any provision of Purchaser's organizational documents or of any agreements, regulations, or laws to or by which Purchaser is bound. This Agreement has been duly authorized, executed and delivered by Purchaser, is a valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws affecting the rights of creditors generally; and (ii) the exercise of judicial discretion in accordance with general principles of equity.

(b) **Consents.** Subject to Purchaser's customary internal approval process for real estate purchases, Purchaser has obtained all consents and permissions (if any) related to the transaction contemplated in this Agreement and required under Purchaser's organizational documents or any covenant, agreement, encumbrance, law or regulation by which Purchaser is bound.

(c) **Pending Actions.** There is no action, suit, arbitration, administrative or judicial administrative proceeding, or unsatisfied order or judgment pending or, to Purchaser's actual knowledge, threatened against Purchaser or the transaction contemplated by this Agreement, which, if adversely determined, could individually or in the aggregate have a material adverse effect on Purchaser's ability to consummate the transaction contemplated in this Agreement.

(d) **OFAC.** Purchaser is in compliance with the Orders. Neither Purchaser nor any other party that directly or indirectly (a) controls Purchaser, or (b) has an ownership interest in Purchaser, is listed on the Lists; provided, however, Purchaser makes no representation with respect to any shareholder of publicly traded securities. Purchaser has not been determined by competent authority to be subject to the prohibitions contained in the Orders. Purchaser is not owned or controlled by, or acts for or on behalf of, any party on the Lists or any other party who has been determined by competent authority to be subject to the prohibitions contained in the Orders.

(e) **Contractors and Suppliers.** All contractors, subcontractors, suppliers, architects, engineers, and others who have performed services or labor for or supplied material to Purchaser with respect to the Property have been paid in full, and all liens arising from any such services, labor or materials (or claims with which the passage of time or notice or both could mature into liens) have been satisfied and released.

(f) **Permits and Legal Compliance.** Purchaser has not received written notice of an intention of any governmental authority to revoke any license, permit or certificate required for the development, use, operation or occupancy of the Property by Purchaser. Purchaser has not received any written notice that the Property is in violation of any zoning, building, fire, health, environmental or other law, statute, ordinance, regulation or order of any governmental or public authority applicable to the Property or any private covenants or restrictions encumbering the Property that remains uncured.

(g) **Financial Status.** Purchaser is solvent, has not made a general assignment for the benefit of its creditors, and has not admitted in writing its inability to pay its debts as they become due. Purchaser has neither filed, nor does it contemplate the filing of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or any other proceeding for the relief of debtors in general, nor has any such proceeding been instituted by or against Purchaser, nor is any such proceeding to Purchaser's knowledge threatened or contemplated. The purchase of the Property will not render Purchaser insolvent. Purchaser shall promptly following written request provide Seller with accurate and complete copies of its financial statements, bank records, and other reasonable documents requested by Seller to verify Purchaser's financial status and/or compliance with the Lease Agreement or the Transition Agreement.

(h) **Environmental Matters.** (i) Purchaser has received no written notice from any governmental authority, neighboring property owner or other party asserting any violation of Environmental Laws related to the Property, (ii) Purchaser has not commissioned any study or investigation relating to the presence or absence of Hazardous Materials on the Property, (iii) to Purchaser's knowledge, no areas on the Property exist where Hazardous Materials have been generated, disposed of, released or found, and no Hazardous Materials are present or have been released in a reportable quantity, where such a quantity has been established by Environmental Laws, at, on or under the Property, (iv) to Purchaser's knowledge, there are no areas on the Property for the storage or disposal of any Hazardous Materials, (v) Purchaser has no knowledge that the Property, or current or former operations on the Property, are not or have not been in compliance with Environmental Laws or that Purchaser has liability with respect thereto, (vi) to Purchaser's knowledge, neither Purchaser nor the Property is in violation of any Environmental Laws and there is no asbestos, PCB's or lead paint on the Property or any part of the Property, (vii) to Purchsaer's knowledge, there are no storage tanks located on the Property, either above or below ground, or any underground pipes or lines on the Property, active or abandoned, and (viii) to Purchaser's knowledge, the Property previously has not been used as a landfill or as a dump for garbage or refuse.

(i) **Release of Seller.** Purchaser has obtained or will obtain on or prior to the Closing Date, a full and unconditional release of Seller and James R. Schrader (the "Release"), in form and substance reasonably acceptable to Seller and James R. Schrader, executed by all parties who have bonds and/or loans from Purchaser as reflected in Exhibit D to the Transition Agreement or Schedule 4.2 to this Agreement, pursuant to which such parties irrevocably release, acquit and forever discharge Seller, James R. Schrader, their respective affiliates, and each of their respective shareholders, officers, directors, spouses, employees, agents, successors and assigns from any and all claims, demands, liabilities, obligations, causes of action, damages, costs, and expenses of any kind or nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, arising out of or relating to the Transition Agreement, bonds and/or loans to Purchaser or James R. Schrader reflected in Exhibit D to the Transition Agreement, Schedule 4.2 of this Agreement, or any transactions associated with or relating thereto.

~~(d)~~(j) **Purchaser's Own Investigation.** Purchaser is acquiring the Property based solely on its own independent investigation and inspection of the Property and not in reliance on any information provided by Seller, except for the representations, warranties and covenants of Seller expressly set forth herein. Except as expressly set forth herein, Purchaser expressly disclaims any intent to rely on any Property Documents or other materials provided to it by Seller in connection with its due diligence and agrees that it shall rely solely on its own independently developed or verified information.

**5.5 Survival of Purchaser's Representations and Warranties.** The representations and warranties of Purchaser set forth in Section 5.4 shall survive Closing for a period of one (1) year after Closing, unless notice setting forth a specific claim under any such representation or warranty shall be given to Purchaser within that period, in which case such representation or warranty shall survive until such claim is finally and fully resolved.

**5.6 Covenants of Tenant.** Tenant covenants with Seller, from the Effective Date until Closing or earlier termination of this Agreement, as follows:

(a) **Maintenance of Property.** Tenant shall maintain the Property in the ordinary course of business consistent with Tenant's past practices before the Effective Date, and in all events, in compliance with applicable law and the Lease.

(b) **Provide Copies of Notices.** Tenant shall furnish Seller with a copy of all written notices received by Tenant from any governmental authority or other party of any violation of any law, statute, ordinance, regulation or order of any governmental or public authority relating to the Property on or before the date that is five (5) business days after Tenant's receipt of such notice, but, if received by such date, in no event later than two (2) business days before the Closing Date.

(c) **Execution of New Contracts.** Tenant shall not, without Seller's prior written consent in each instance (which consent may be withheld in Seller's sole discretion), enter into any contract or agreement that will be an obligation affecting the Property or binding on Seller after Closing.

(d) **Maintenance of Permits.** Tenant shall maintain in existence all licenses, permits and approvals that are now in existence with respect to, and are required for, the operation of the Tenant's business at the Property pursuant to the Lease Property, and are of a continuing nature.

(e) **Compliance with Lease and Transition Agreement**. Tenant shall be in compliance with all representations, warranties, covenants and agreements of Tenant pursuant to the Lease and the Transition Agreement and shall provide reasonable documentation of same to Seller promptly following written request by Seller.

(f) **Disposition of the Property and Other Matters.** For so long as this Agreement remains in force, Tenant shall not:

(1) sell, assign, rent, lease, convey (absolutely or as security), grant a security interest in, or otherwise encumber or dispose of, Tenant's interest in the Property, change or request a change in the zoning classification of the Property or any development restrictions applicable to the Property, or consent to or acquiesce in any of the foregoing;

(2) enter into any contract that will be an obligation affecting the Property or binding on Seller after Closing; or

(1)(3) enter into any lease, sublease, license or occupancy agreement of all or any part of the Property.

## ARTICLE 6

## DEFAULT

**6.1 Default by Purchaser**. If the sale of the Property as contemplated under this Agreement is not consummated due to Purchaser's breach or default under this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such default, to terminate this Agreement and the Earnest Money, plus the interest accrued thereon, if any, shall be paid to Seller as full liquidated damages for such breach or default by Purchaser. It is specifically understood and agreed that payment of the Earnest Money to Seller, as liquidated damages, is Seller's sole and exclusive remedy hereunder, and Seller is hereby specifically waiving and relinquishing any and all other remedies at law or in equity. The parties acknowledge that the actual amount of the damages which Seller would sustain as a result of Purchaser's breach or default of this Agreement are difficult or impossible to estimate, that the Earnest Money represents the parties' best estimate of Seller's damages in the event of such breach or default, that said stipulated sum is a reasonable pre-estimate of the probable loss resulting from such a breach or default, and that payment of the Earnest Money to Seller is not to be construed as a penalty or forfeiture Seller waives and releases any right to (and covenants that it shall not) sue Purchaser: (i) for specific performance of this Agreement, or (ii) to recover any damages of any nature or description.

**6.2 Default by Seller.** If the sale of the Property as contemplated under this Agreement is not consummated due to Seller's default under this Agreement, then Purchaser shall have the right to (i) seek specific performance of this Agreement, or (ii) terminate this Agreement by providing written notice of such termination to Seller, whereupon the Earnest Money, plus any interest accrued thereon, shall be returned to Purchaser, and the parties shall have no further rights, duties, liabilities or obligations hereunder, except as expressly set forth herein may exercise any rights or remedies of Purchaser under this Agreement, at law or in equity. Without limitation on the foregoing, Purchaser shall have the right to seek specific performance of this Agreement, injunctive relief and other equitable remedies.

**6.3 Notice of Default; Opportunity to Cure.** Neither Seller nor Purchaser shall be deemed to be in default under this Agreement until and unless such party has been given written notice of its failure to comply with the terms of this Agreement and thereafter does not cure such failure on or before the date that is five (5) business days after receipt of such notice; provided, however, that this Section 6.3 shall not have the effect of extending the Closing Date.

## ARTICLE 7

## RISK OF LOSS

**7.1 Risk of Loss.** Until the purchase of the Property has been consummated on the Closing Date, all risk of loss of, damage to, or destruction of, the Property (whether by fire, flood, tornado or other casualty, or by the exercise of the power of eminent domain, or otherwise) shall belong to and be borne by Seller, or Tenant to the extent Tenant is responsible under the Lease. For purposes of this Agreement, any contamination of the Property with Hazardous Materials, or release or discharge at the Property of Hazardous Materials, occurring on or after the Effective Date shall constitute a casualty and shall belong to and be borne by Tenant.

**7.2 Casualty or Condemnation.** In the event of any damage to or destruction of the Property or any material portion of the Property or in the event of any taking or threat of taking by condemnation (or any conveyance in lieu of condemnation) of any portion of the Property (or any interest in or rights appurtenant to the Property) by anyone having the power of eminent domain, Purchaser shall, by written notice to Seller delivered on or before the date that is ten (10) business days after receiving written notice from Seller of such event, elect to: (i) terminate this Agreement and all of Purchaser's obligations under this Agreement, whereupon this Agreement shall terminate and Purchaser and Seller shall have no further rights and obligations under this Agreement except those which expressly survive termination of this Agreement; or (ii) consummate the purchase of the Property. If Purchaser does not elect to terminate this Agreement pursuant to clause (i) of this Section 7.2, then Seller shall on the Closing Date pay to Purchaser all insurance proceeds then received by Seller and all condemnation awards and compensation then received by Seller. In addition, Seller shall transfer and assign to Purchaser, in form reasonably satisfactory to Purchaser, all rights and claims of Seller with respect to payment for damages and compensation on account of such damage, destruction or taking.

**7.3 Notice of Condemnation or Casualty.** Seller shall notify Purchaser promptly~~immediately~~ upon Seller's receiving notice of the occurrence or existence of any damage, destruction, condemnation or threat of condemnation affecting the Property and, at the same time, shall provide Purchaser with such information with respect thereto as is in Seller's possession to aid Purchaser in making, on an informed basis, the election between the alternatives provided by clauses (i) and (ii) in Section 7.2. Notwithstanding anything in this Agreement to the contrary, Purchaser shall have ten (10) business days after it receives such information from Seller within which to elect between such alternatives, and, accordingly, the Closing Date shall be postponed, if and to the extent necessary, to allow Purchaser such a ten (10) business day period in which to make the election under Section 7.2.

## ARTICLE 8

## MISCELLANEOUS

**8.1 Public Disclosure.** Before Closing, any press release or similar public announcement with respect to the transaction contemplated in this Agreement or any matters set forth in this Agreement will be made only in the form mutually approved by Purchaser and Seller. Notwithstanding anything to the contrary in this Agreement, Purchaser shall have the right to make all disclosures with regard to the transaction contemplated in this Agreement as are required under applicable law and regulation, including, without limitation, all applicable laws and regulations relating to securities, securities exchanges and the issuers of securities.

**8.2 Notices.** Any notice, demand, request or other communication (a "*notice*") required or permitted to be given under this Agreement shall be in writing and shall be delivered by hand or overnight courier (such as United Parcel Service or Federal Express), sent by electronic mail or mailed by United States registered or certified mail, return receipt requested, postage prepaid and addressed to each party at its address as set forth below. All notices delivered by hand shall be deemed given upon the date so received; those given by commercial courier as provided above shall be deemed given on the date deposited; and those given by electronic mail shall be deemed given on the date of electronic mail transmittal. Nonetheless, the time period, if any, in which a response to any notice must be given shall commence to run from the date of receipt of the notice by the addressee of such notice. Any notice not received because of changed address or electronic mail address of which no notice was given as provided above or because of refusal to accept delivery shall be deemed received by the party to whom addressed on the date of hand delivery, on the first calendar day after deposit with commercial courier, or on the date of electronic mail transmittal, as the case may be. By giving at least five (5) days' prior written notice, any party may from time to time and at any time change its mailing address under this Agreement. Any notice of any party may be given by such party's counsel.

The parties' respective addresses for notice purposes are as follows.

If to Purchaser: The Frazer School, Inc.
4700 NW 89th Blvd.
Gainesville, FL 32606

Attention: Olanrewaju Fayiga
Email: fayigaoi@frazerschool.org

with a copy to:

Eversheds Sutherland (US) LLP
999 Peachtree Street, NE
Suite 2300
Atlanta, GA 30309
Attn: Rachel Reid
Email: RachelReid@eversheds-sutherland.com

If to Seller:

**~~[*INSERT SELLER'S CONTACT INFO]~~Newberry Christian Community School, Inc.**
1520 NW 34th Street
Gainesville, Florida 32605
Attention: James R. Schrader, President
Telephone: (850) 758-1219
Email: jrschr10@gmail.com

with a copy to:

**~~[*INSERT SELLER'S COUNSEL CONTACT INFO]~~Withers Harvey, P.A.**
1120 NW 8th Avenue
Gainesville, Florida 32601
Attention: Richard I. Withers
Telephone: (352) 727-4404
Email: richard@withersharvey.com

**8.3 Modifications.** This Agreement cannot be changed orally, and no agreement shall be effective to waive, change, modify or discharge it in whole or in part unless such agreement is (i) in writing, (ii) identified as a waiver, change, modification or discharge of this Agreement, as applicable, and (iii) is signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

**8.4 Calculation of Time Periods.** Unless otherwise specified in this Agreement, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday under the laws of the State in which the Property is located, in which event the period shall run until the end of the next business day. The final day of any such period shall be deemed to end at 6:00 p.m. (Gainesville, Florida local time). As used in this Agreement, the term "*business day*" shall be deemed to mean any day, other than a Saturday or Sunday or a day on which commercial banks in the State of Florida~~Georgia~~ are authorized to be closed for business.

**8.5 Successors and Assigns.** The terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties to this Agreement.

**8.6 Entire Agreement.** This Agreement, including the Schedules and Exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

**8.7 Further Assurances.** Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement. Without limiting the generality of the foregoing, Purchaser shall, if requested by Seller, execute acknowledgments of receipt with respect to any materials delivered by Seller to Purchaser with respect to the Property. The provisions of this Section 8.7 shall survive Closing.

**8.8 Counterparts; Electronic Signatures Binding.** To facilitate execution of this Agreement, this Agreement may be executed in multiple counterparts, each of which, when assembled to include an original or electronic mail (in .PDF or similar file) signature for each party contemplated to sign this Agreement, will constitute a complete and fully executed agreement. All such fully executed original or electronic mail (in .PDF or similar file) counterparts will collectively constitute a single agreement, and such signatures shall be legally binding upon the party sending the signature by such electronic means immediately upon being sent by such party. Further, the parties agree that signatures by DocuSign, Sign-n-Send or other similar electronic signing software will be deemed to be originals.

**8.9 Severability.** If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

**8.10 Applicable Law.** This Agreement is performable in the state in which the Property is located and shall in all respects be governed by, and construed in accordance with, the substantive federal laws of the United States and the laws of such state. Seller and Purchaser irrevocably submit to the jurisdiction of any state or federal court sitting in the state and judicial district in which the Property is located in any action or proceeding arising out of or relating to this Agreement and irrevocably agree that all claims in respect of such action or proceeding shall be heard and determined in a state or federal court sitting in the state and judicial district in which the Property is located. Purchaser and Seller agree that the provisions of this Section 8.10 shall survive Closing of the transaction contemplated by this Agreement.

**8.11 No Third Party Beneficiary.** The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

**8.12 Exhibits and Schedules.** The following schedules or exhibits attached to this Agreement shall be deemed to be an integral part of this Agreement:

| | | |
|---|---|---|
| **Schedule A** | - | Legal Description of the Land |
| **Schedule 2.4** | - | Required Title Policy Endorsements |

| | | |
|---|---|---|
| **Schedule 3.1(b)** | - | Property Documents |
| **Schedule 4.2** | - | Noteholders |
| **Schedule 4.4(a)** | - | Form of Limited Warranty Deed |
| **Schedule 4.4(b)** | - | Form of Bill of Sale and Assignment |
| **Schedule 4.4(c)** | - | Form of Seller's Closing Certificate |
| **Schedule 5.1** | - | Seller's Disclosure Statement |
| **Schedule 5.1(g)** | - | Environmental Reports |

**8.13 Captions.** The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any section or any subsection of this Agreement.

**8.14 Construction.** The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits, schedules or amendments to this Agreement.

**8.15 Termination of Agreement.** It is understood and agreed that if either Purchaser or Seller terminates this Agreement pursuant to a right of termination granted under this Agreement, such termination shall operate to relieve Seller and Purchaser (in which event the defaulting party shall remain liable as provided in this Agreement) from all obligations under this Agreement, except for such obligations as are specifically stated in this Agreement to survive the termination of this Agreement.

**8.16 Survival.** All provisions of this Agreement which are not fully performed as of Closing shall survive Closing subject to the terms and provisions set forth in Sections 5.2 and 5.5 respectively.

**8.17 Time of Essence.** Time is of the essence with respect to this Agreement.

**8.18 Legal Fees.** In the event of any legal action or proceeding instituted with respect to this Agreement, the party prevailing in such action or proceeding shall be entitled to collect from the non-prevailing party reasonable attorney fees, paralegal fees, law clerk fees and other legal costs and expenses, whether incurred at or before trial, and whether incurred at the trail level or in any appellate, bankruptcy, collection or other legal proceedings.

## ARTICLE 9

## INDEMNIFICATION

**9.1** Seller hereby agrees to indemnify and hold Purchaser harmless against and in respect of any and all debts, claims, actions, losses, costs, damages, expenses, deficiencies or liabilities incurred by Purchaser as a result of or relating to (i) Seller's ownership of the Property prior to Closing, (ii) any material misrepresentation, breach of warranty or non-fulfillment of any covenant or agreement on the part of Seller under this Agreement, or (iii) any misrepresentation contained in or occasioned by any certificate or other instrument furnished or to be furnished by Seller to Purchaser under this Agreement, and any and all assessments, judgments, costs and other reasonable expenses incidental

to any of the foregoing, including, but not limited to, reasonable attorneys' fees, paralegal fees, law clerk fees and other legal costs and expenses.

**9.2** Purchaser hereby agrees to indemnify and hold Seller harmless against and in respect of any and all debts, claims, actions, losses, costs, damages, expenses, deficiencies or liabilities incurred by Seller as a result of or relating to (i) Purchaser's ownership of the Property after Closing, (ii) Purchaser's occupancy and use of the Property prior to Closing pursuant to the Lease, (iii) any material misrepresentation, breach of warranty or non-fulfillment of any covenant or agreement on the part of Purchaser under this Agreement, or (iv) any misrepresentation contained in or occasioned by any certificate or other instrument furnished or to be furnished by Purchaser to Seller under this Agreement, and any and all assessments, judgments, costs and other reasonable expenses incidental to any of the foregoing, including, but not limited to, reasonable attorneys' fees, paralegal fees, law clerk fees and other legal costs and expenses.

[signatures commence on following page]

IN WITNESS WHEREOF, the parties to this Agreement have duly executed this Agreement as of the Effective Date.

**PURCHASER/TENANT:**

The Frazer School, Inc.,
a Florida corporation

By: ______________________________
Name: ______________________________
Title: ______________________________

[signatures continued on the following pages]

**SELLER:**

Newberry Christian Community School, Inc.,
a Florida nonprofit corporation

By: ______________________________
Name: ____________________________
Title: _____________________________

[signatures continued on the following pages]

# SCHEDULE A

## Legal Description of Land

[*INSERT LEGAL DESCRIPTION]

# SCHEDULE 2.4

**Required Title Policy Endorsements**

**[TBD]**

1. [*Zoning – Unimproved Land – ALTA 3] ***or*** [*Zoning – Completed Structure – ALTA 3.1] ***or*** [*Zoning – Land Under Development – ALTA 3.2]
2. Commercial Environmental Protection Lien – ALTA 8.2-06
3. [*Covenants, Conditions and Restrictions – Unimproved Land – ALTA 9.1-06] ***or*** [*Covenants, Conditions and Restrictions – Improved Land – ALTA 9.2-06] ***or*** [*Covenants, Conditions and Restrictions – Land Under Development – ALTA 9.8-06]
4. Private Rights – ALTA 9.9-06
5. Access and Entry – ALTA 17-06
6. [*Single Tax Lot – ALTA 18-06] ***or*** [*Multiple Tax Parcel – ALTA 18.1-06 or 18.2-06]
7. [*Contiguity – Multiple Parcels – ALTA 19-06] ***or*** [*Contiguity – Single Parcel – ALTA 19.1-06]
8. Same as Survey – ALTA 25-06
9. Subdivision – ALTA 26
10. Policy Authentication – ALTA 39-06
11. Waiver of Arbitration
12. “Gap” Coverage

[NEED TO CONFIRM WHICH WILL BE INCLUDED]

**SCHEDULE 3.1(b)**

**Property Documents**

1. Copies of all tax bills for the Property for the last three (3) years;

2. Copies of all environmental reports related to the Property;

3. Copies of all surveys, plats, subdivision plats, site plans and topographical maps related to the Property;

4. Copies of all soils, geological and engineering reports related to the Property;

5. Information regarding current zoning of the Property and other relevant land-use information;

6. Copies of all utility agreements and reservations related to the Property;

7. Copies of all title insurance policies and title exception documents for the Property; and

8. If applicable, copies of all leases of all or any part of the Property and other agreements relating to the use and operation of all or any part of the Property.

# SCHEDULE 4.2

**Noteholders**

[NEED TO ADD COMPLETE LIST AND AMOUNTS]

**SCHEDULE 4.4(a)**

**Form of Special Warranty Deed**

**When recorded, return to:**

____________________
____________________
____________________
____________________

**Tax Parcel Number: ____________________**

**LIMITED WARRANTY DEED**

THIS LIMITED WARRANTY DEED, made this ___ day of ___________, 2026, between **Newberry Christian Community School, Inc.**, a Florida nonprofit corporation ("*Grantor*"), and **The Frazer School, Inc.**, a Florida corporation ("*Grantee*"; the words "*Grantor*" and "*Grantee*" to include their respective heirs, successors and assigns where the context requires or permits);

WITNESSETH:

For and in consideration of the sum of $10.00 and other good and valuable consideration delivered to Grantor by Grantee at and before the execution, sealing and delivery hereof, the receipt and sufficiency of which are hereby acknowledged, Grantor has and hereby does grant, bargain, sell, alien, convey, and confirm unto Grantee, all that tract or parcel of land lying and being in [*Land Lot __ of the ___ Land District of Alachua County, Florida], as more particularly described on Exhibit A (the "*Land*"), subject to all matters set forth on Exhibit B (the "*Permitted Exceptions*").

TO HAVE AND TO HOLD said Land, together with any and all improvements located thereon, and any and all of the rights, members, easements, hereditaments, and appurtenances thereof to the same being, belonging or in anywise appertaining to the only proper use, benefit, and behoof of Grantee, subject to the Permitted Exceptions, forever, in FEE SIMPLE.

AND, SUBJECT TO the Permitted Exceptions, Grantor shall warrant and forever defend the right and title to said Land unto Grantee, against the claims of all persons whomsoever claiming by, through or under Grantor, but not otherwise.

[signature appears on following page]

IN WITNESS WHEREOF, Grantor has executed this Special Warranty Deed under seal as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

________________________________
Witness

________________________________
Notary Public

My Commission Expires:

_________________________________
[NOTARIAL SEAL]

**GRANTOR:**

**NEWBERRY CHRISTIAN COMMUNITY SHOOL, INC., a Florida nonprofit corporation**

By: _____________________________ [SEAL]
Name: __________________________
Its: _____________________________

**Exhibits to Special Warranty Deed**

Exhibit A -- Legal Description of the Property

Exhibit B -- Permitted Exceptions

**SCHEDULE 4.4(b)**

**Form of Bill of Sale and Assignment**

**BILL OF SALE AND ASSIGNMENT**

This BILL OF SALE AND ASSIGNMENT (this "*Assignment*") is made and entered into this ____ day of _____, 2026, between Newberry Christian Community School, Inc.**,** a Florida nonprofit corporation ("*Seller*"), and The Frazer School, Inc., a Florida corporation ("*Purchaser*").

**BACKGROUND:**

A. Seller and Purchaser entered into that certain Purchase and Sale Agreement, dated _______ ___, 2026 (as may be amended and/or assigned from time to time, the "*Contract*").

B. Concurrently with the execution and delivery of this Assignment and pursuant to the Contract, Seller is conveying to Purchaser, by Special Warranty Deed, (i) that certain tract or parcel of real property located in Alachua County, Florida, and more particularly described on Exhibit A (the **"***Land*"), (ii) those rights, easements and appurtenances pertaining to the Land (the **"***Related Rights***"**), and (iii) the buildings, structures, fixtures and other improvements, if any, on and within the Land (the "*Improvements*"; and the Land, the Related Rights and the Improvements being sometimes collectively referred to as the "*Real Property*").

C. Seller has agreed to convey to Purchaser certain personal property as set forth in this Assignment.

**AGREEMENT:**

NOW, THEREFORE, in consideration of the receipt of Ten Dollars ($10.00), the assumptions by Purchaser set forth in this Assignment and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Seller and Purchaser agree as follows:

1. **Bill of Sale.** Seller sells, assigns, transfers and conveys to Purchaser all of Seller's right, title and interest in, to and under all governmental and non-governmental permits, licenses, consents, approvals and authorizations, if any, belonging to or inuring to the benefit of Seller and pertaining to the Real Property, to the extent that such permits, licenses, consents and approvals are assignable at no cost by Seller (collectively, the "*Intangible Property*"). Seller warrants to Purchaser that Seller has not sold, transferred, assigned, pledged, encumbered or otherwise conveyed to any third party its right, title and interest in the Intangible Property.

2. **Successors and Assigns.** This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of the parties to this Assignment.

3. **Governing Law.** This Assignment shall be construed under and enforced in accordance with the laws of the State of Florida.

[signatures commence on following page]

EXECUTED effective as of the date first above written.

**SELLER:**

**NEWBERRY CHRISTIAN COMMUNITY SHOOL, INC., a Florida nonprofit corporation**

By: ________________________
Name: ______________________
Title: ______________________

**Exhibits to Bill of Sale and Assignment**

Exhibit A -- Legal Description of the Property

# SCHEDULE 4.2(c)

**Form of Seller's Closing Certificate**

**CERTIFICATE OF SELLER'S REPRESENTATIONS AND WARRANTIES**

THIS CERTIFICATION is made this ___ day of ___________, 2026 by Newberry Christian Community School, Inc., a Florida nonprofit corporation ("*Seller*"), in favor of and The Frazer School, Inc., a Florida corporation ("*Purchaser*").

Seller certifies that the representations and warranties of Seller set forth in Section 5.1 of that Purchase and Sale Agreement, dated ____________ ___, 2026, between Seller and Purchaser (as may be amended and/or assigned from time to time, the "*Contract*"), are (i) with respect to all such representations and warranties which are not qualified by materiality, true and correct in all material respects as of the date hereof, and (ii) with respect to all such representations and warranties which are qualified by materiality, true and correct in all respects as of the date hereof.

This certificate is delivered pursuant to Section 4.4(c) of the Agreement and shall survive for the period set forth in Section 5.2 of the Agreement.

[signature appears on following page]

**SELLER:**

**NEWBERRY CHRISTIAN COMMUNITY SHOOL, INC., a Florida nonprofit corporation**

By: ________________________
Name: ______________________
Title: ______________________

Date of Execution: ____________

**Exhibits to Seller's Closing Certificate**

Exhibit A – Disclosed Items

# SCHEDULE 5.1

## Seller's Disclosure Statement

[*To be completed by Seller; if none, insert "None"]

Add Schedule 5.1(c). Pending Actions – Disclose potential or threatened legal actions by Ethan Fieldman, Kurt and Brittany Dudas, IRS re Payroll Taxes, and Parents who have promissory notes.

Add Schedule 5.1(f) . Add Lease Agreement and any other Existing Contracts

# SCHEDULE 5.1(g)

## Environmental Reports

[*To be completed by Seller; if none, insert "None"]

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "*Agreement*") is made as of April ___, 2026 (the "*Effective Date*"), between **The Frazer School, Inc.,** a Florida corporation ("*Purchaser*"), and **Newberry Christian Community School, Inc.,** a Florida nonprofit corporation ("*Seller*").

## BACKGROUND:

A. Seller is the owner of that certain parcel of land consisting of approximately *___ acres, located in Alachua County, Florida, and more particularly described on Schedule A (the "*Land*").

B. Seller desires to sell, and Purchaser desires to purchase, the Property (as defined below) upon and subject to the terms and conditions set forth in this Agreement.

C. Seller and Purchaser are parties to that certain School Transition and Asset Purchase Agreement dated December 17, 2025 (the "*Transition Agreement*"), pursuant to which Purchaser has the option to purchase the Property on the terms and conditions set forth in the Transaction Agreement, and the Transition Agreement is currently in full force and effect.

## AGREEMENT:

NOW, THEREFORE, for and in consideration of the foregoing premises, the mutual covenants and agreements set forth in this Agreement, and other good and valuable consideration, all of which each party respectively agrees constitutes sufficient consideration received at or before the execution and delivery of this Agreement, the parties, intending to be legally bound, agree as follows:

## ARTICLE 1

## PURCHASE AND SALE

**1.1 Agreement of Purchase and Sale.** Subject to the terms and conditions set forth in this Agreement, and pursuant to the terms and conditions agreed to in the Transition Agreement, Purchaser hereby exercises its option to purchase the Property and Seller agrees to sell and convey and Purchaser agrees to purchase the following:

(a) the Land;

(b) those rights, easements and appurtenances pertaining to the Land, including (i) all right, title and interest of Seller (if any) in and to adjacent streets, alleys or rights-of-way, (ii) strips, gaps and gores, if any, in connection with the Land, (iii) any and all oil, gas and minerals lying under, in, on or about or constituting a part of the Land, regardless of whether the minerals are considered part of the surface estate or part of the mineral estate, and (iv) all right, title and interest of Seller with respect any easements or covenants that benefit or burden the Land (collectively, the "*Related Rights*");

(c) the structures and other improvements (if any) on the Land (collectively, the "*Improvements*," and the Land, the Related Rights and the Improvements being collectively referred to as the "*Real Property*");

(d) all of Seller's right, title and interest in, to and under all governmental and non-governmental permits, licenses, consents, approvals and authorizations if any, belonging to or inuring to the benefit of Seller and pertaining to the Real Property, to the extent that such permits, licenses, consents and approvals are assignable at no cost by Seller (collectively**,** the "*Intangible Property*").

**1.2 Property Defined.** The Land, the Related Rights, the Improvements and the Intangible Property are referred to collectively as the "*Property*."

**1.3 Permitted Exceptions.** Seller shall convey the Property, and Purchaser shall accept the Property, subject to the matters which are, or are deemed to be, Permitted Exceptions pursuant to Article 2 (collectively, the "*Permitted Exceptions*").

**1.4 Purchase Price.** Seller is to sell and Purchaser is to purchase the Property for a total purchase price of **Thirteen Million Five Hundred Three Thousand Eighty-Four and 70/100 Dollars ($13,503,084.70)** (the "*Purchase Price*").

**1.5 Payment of Purchase Price.** The Parties expressly acknowledge and agree that (a) the Purchase Price shall be funded through loan proceeds arranged by Purchaser and complete satisfaction and release of that certain obligation owing from Seller to Purchaser in the amount of $5,119,262.85 (referred to in the Transition Agreement and this Agreement as the "Equity Credit"), (b) Seller shall receive no cash proceeds from the sale of the Property and (c) at Closing (as defined below), all funds shall be disbursed by the Closing Agent solely in accordance with the priority disbursement schedule set forth in Section 4.2.

## ARTICLE 2

## TITLE AND SURVEY

**2.1 Title Examination; Commitment for Title Insurance.** Purchaser shall have Seller's title to the Property examined. The report of such title examination shall be in the form of an owner's title insurance commitment (as initially issued to Purchaser, the "*Title Commitment*") issued by the title insurer.

**2.2 Survey.** On or before the date that is ten (10) days prior to the Inspection Date, Purchaser may, at Purchaser's expense, have the Real Property accurately surveyed by a licensed surveyor or engineer of Purchaser's choice showing the actual boundaries of the Real Property, the acreage contained in the Land, the location of the Improvements and such other matters as Purchaser deems appropriate. Such survey shall constitute the "*Survey*." For purposes of the Deed (as defined below) to be delivered to Purchaser at Closing, the legal description of the Real Property shall be the legal description attached as Schedule A or such other legal description by which Seller acquired title to the Property, as elected by Purchaser. If, however, the metes and

bounds description drawn from the Survey reflects a legal description different from the legal description attached as Schedule A, at Closing, Seller shall also deliver to Purchaser a quitclaim deed, in form and content reasonably satisfactory to Purchaser and Seller, containing the legal description drawn from the Survey.

**2.3 Title Objections; Cure of Title Objections.**

(a) Purchaser shall have until the date that is ten (10) days prior to the Inspection Date to notify Seller, in writing, of such objections as Purchaser may have to the Title Commitment (including the title exception documents referred to in the Title Commitment) or the Survey, other than the Permitted Exceptions described in clauses (a) and (b) of Section 2.4. Any item contained in the Title Commitment or shown on the Survey to which Purchaser does not object on or before the Inspection Date shall be deemed a "*Permitted Exception*."

(b) If Purchaser shall notify Seller of objections to title or matters shown on the Survey on or before the Inspection Date, Seller shall have the right, but not the obligation, to cure such objections. On or before the fifth (5th) business day from and after Seller's receipt of Purchaser's notice of objections, Seller shall notify Purchaser in writing whether Seller elects to attempt to cure such objections. Seller's failure to provide such a notice shall be deemed an election by Seller not to cure any such objection. If Seller elects to attempt to cure, and provided that Purchaser shall not have terminated this Agreement in accordance with Section 3.2 hereof, then Seller shall be obligated to cure such objection or objections. If Seller elects, or is deemed to have elected, not to cure any objections specified in Purchaser's notice, then in either such case Purchaser shall have the right to elect one, but not both, of the following options, which election must in each case be made within the time period provided in paragraph (c) below:

(1) to accept a conveyance of the Property subject to the Permitted Exceptions, specifically including any matter objected to by Purchaser which Seller is unwilling or unable to cure, and without reduction of the Purchase Price; or

(2) to terminate this Agreement by sending written notice of such termination to Seller, and upon delivery of such notice of termination, this Agreement shall terminate, and thereafter neither party to this Agreement shall have any further rights, obligations or liabilities under this Agreement except to the extent that any right, obligation or liability set forth in this Agreement expressly survives termination of this Agreement.

(c) If Seller notifies Purchaser that Seller does not intend to attempt to cure any title objection, or if Seller is deemed to have elected not to cure any title objections, then in any such case Purchaser shall, on or before the date that is five (5) business days after receiving Seller's notice or the date of Seller's deemed election, as applicable, notify Seller in writing whether Purchaser shall elect to accept the conveyance under clause (b)(1) above or to terminate this Agreement under clause (b)(2) above. Purchaser's failure

to provide such a notice will be deemed an election by Purchaser to accept conveyance under clause (b)(1) above.

(d) Notwithstanding anything contained in this Agreement to the contrary, Seller shall be obligated at Closing to discharge all mortgages and other monetary liens encumbering the Property (regardless of whether Purchaser objects to such mortgage or monetary lien). (The term "*mortgage*" as used in this Agreement includes any mortgage, deed of trust, deed to secure debt and similar security instrument securing an indebtedness of Seller and encumbering the Property or any portion of the Property; the terms "*discharge*" and "*discharged*" as used in this Agreement include compliance with a statutory bonding procedure that has the legal effect of removing the mortgage or other item as a lien on the Property).

**2.4 Conveyance of Title.** At Closing, Seller shall convey and transfer the Property to Purchaser. It shall be a condition to Purchaser's obligation to close this transaction that the title company shall have issued the Title Policy to Purchaser (or unconditionally committed to issue the Title Policy to Purchaser upon receipt of the title insurance premium for such Title Policy). **"***Title Policy***"** means an extended coverage American Land Title Association (ALTA) Form 2021 Owner's Policy of Title Insurance (or such other comparable form of title insurance policy as is available in the jurisdictions in which the Real Property is located) insuring Purchaser's fee simple title to the Real Property, in the full amount of the Purchase Price with the standard exceptions deleted, subject only to the following matters, which shall be deemed to be Permitted Exceptions, and including the endorsements set forth in Schedule 2.4:

(a) the lien of all ad valorem real estate taxes and assessments not yet due and payable as of the Closing Date (as defined below), subject to proration and adjustment as provided in this Agreement;

(b) local, state and federal laws, ordinances or governmental regulations, including but not limited to, building, zoning and land use laws, ordinances and regulations, now or hereafter in effect relating to the Property;

(c) additional items, if any, appearing of record or shown on the Survey, approved or deemed approved by Purchaser pursuant to Section 2.3 or 2.5 hereof; and

(d) additional items, if any, approved by Purchaser pursuant to Section 5.3(e) hereof.

**2.5 Pre-Closing "Gap" Title Defects.** Whether or not Purchaser shall have furnished to Seller any notice of title objections pursuant to the foregoing provisions, Purchaser may, at or before Closing, notify Seller in writing of any objections to title first raised by the title company or the surveyor after the effective date of the Title Commitment or Survey, as appropriate; provided, however, that Purchaser must notify Seller of any such objections on or before the date that is ten (10) business days after Purchaser's first receipt of the updated title commitment or

updated survey, whichever first provides notice of the condition giving rise to any such objection. With respect to any objections to title set forth in such notice, Seller shall have the same option to cure and Purchaser shall have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any notice of objections made by Purchaser on or before the Inspection Date.

## ARTICLE 3

## INSPECTION PERIOD

**3.1 Right of Inspection.**

(a) Beginning upon the Effective Date and continuing thereafter so long as this Agreement remains in full force and effect, Purchaser shall have the right to physically inspect the Property, and Purchaser, personally or through agents, employees or contractors, may go upon the Property during normal business hours or at other reasonable times to make boundary line or topographical surveys and to conduct such studies, tests, samplings, investigations and analyses of any and all aspects of the Property as Purchaser deems desirable, including, without limitation, engineering, environmental, soil, and groundwater and other tests, samplings, investigations and studies of the Property.

(b) In addition to any other obligation to assist Purchaser in the inspection of the Property, Seller agrees to deliver to Purchaser, on or before the date that is five (5) days after the Effective Date, true and correct copies of all materials described on Schedule 3.1(b) (collectively, the "*Property Documents*"), to the extent Seller has not already done so.

**3.2 Right of Termination.** Seller agrees that if Purchaser determines, in Purchaser's sole discretion, that it does not wish to acquire the Property for any reason or no reason, then Purchaser shall have the right to terminate this Agreement by giving written notice of such termination to Seller on or before June 30, 2026 (the "*Inspection Date*"). Upon any such termination of this Agreement pursuant to Purchaser's rights under this Section 3.2, Purchaser and Seller shall have no further rights and obligations under this Agreement except those which expressly survive termination of this Agreement. The period commencing on the Effective Date and ending on the Inspection Date is sometimes referred to in this Agreement as the "*Inspection Period*."

## ARTICLE 4

## CLOSING

**4.1 Time and Place.** The consummation of the transaction contemplated by this Agreement ("*Closing*") shall be conducted by mail or electronic means on or before June 30, 2026 (or such extended date as may be provided under other provisions of this Agreement). The Parties hereby designate David Menet with Salter Feiber, P.A., located in Florida, to serve as the closing agent ("*Closing Agent*"). At Closing, Seller and Purchaser shall perform the obligations set forth

in Section 4.4 and Section 4.5, respectively. Closing may be held at such other place or such earlier time and date as Seller and Purchaser shall mutually approve in writing. The date on which Closing is scheduled to occur under this Agreement (or, if earlier, the date on which Closing occurs) is referred to in this Agreement as the "*Closing Date*."

**4.2 Disbursement by Closing Agent.** At Closing, the Closing Agent shall disburse all funds in the following strict priority order, without deviation, and Seller and Purchaser hereby irrevocably authorizes and directs the Closing Agent to make such disbursements:

| Priority | Payee / Purpose | Approximate Amount |
|---|---|---|
| **(1)** | **Renasant Bank** / Restricted Reserve Account | $2,250,000.00 |
| **(2)** | **Capital City Bank** / existing mortgage payoff | ~$4,100,000.00 |
| **(3)** | **Joiner Construction and other holders of outstanding construction and renovation liens** / satisfaction of all outstanding construction/renovation liens | ~$3,500,000.00 |
| **(4)** | **The Frazer School, Inc.** / payment of principal IRS payroll tax liability | ~$580,000.00 |
| **(5)** | **The Frazer School, Inc. /** payment of outstanding vendor accounts payable, including approximately $200,000 to architect and remaining vendor obligations | ~$404,000.00 |
| **(6)** | **Holders of outstanding promissory notes listed on Schedule 4.2 /** principal reduction and accrued interest payments | ~$1,900,000.00 |
| **(7)** | **The Frazer School, Inc. /** unrestricted working capital | ~$750,000.00 (or remaining balance) |

**4.3 Final Disbursement Schedule.** The Parties acknowledge that the amounts set forth in Section 4.2 are approximate. The Closing Agent shall prepare a final, itemized Closing disclosure and disbursement schedule no fewer than three (3) business days prior to the Closing Date, reflecting exact payoff amounts, lien releases, and final loan proceeds. The Parties shall review and approve the final disbursement schedule prepared in accordance with this Agreement prior to Closing.

**4.4 Seller's Obligations at Closing.** At Closing, Seller shall:

(a) deliver to Purchaser a special warranty deed in the form attached as Schedule 4.4(a), duly executed by Seller, pursuant to which Seller shall convey the Real Property to Purchaser subject only to the Permitted Exceptions (the "*Deed*");

(b) deliver to Purchaser a blanket bill of sale and assignment, in the form attached as Schedule 4.4(b), duly executed by Seller, pursuant to which Seller shall convey the Intangible Property to Purchaser (the "*Bill of Sale and Assignment*");

(c) deliver to Purchaser a certificate ("*Seller's Closing Certificate*"), dated as of the Closing Date and duly executed by Seller, in the form of attached as Schedule 4.4(c), stating that the representations and warranties of Seller contained in Section 5.1 are true and correct in all material respects as of the Closing Date;

(d) deliver to Purchaser such evidence as Purchaser's counsel and/or the title company may reasonably require as to the authority of the person or persons executing documents on behalf of Seller;

(e) deliver to Purchaser an affidavit duly executed by Seller stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act;

(f) deliver to the title company a reasonable and customary title insurance affidavit, duly executed by Seller or a representative of Seller, in form and content reasonably satisfactory to Purchaser and the title company and sufficient for the title company to issue the Title Policy (as defined below);

(g) deliver to Purchaser such certificate or affidavit, if any, as is required under applicable provisions of Florida law and regulation, to assure Purchaser that Florida tax withholding is not required. If Seller fails to deliver such certificate or affidavit, and otherwise fails to provide Purchaser reasonably satisfactory assurance that withholding is not required, then Purchaser shall be entitled to withhold applicable Florida taxes if and to the extent required by applicable Florida law and regulation;

(h) deliver such additional documents as shall be reasonably requested by the title company or Purchaser or required to consummate the transaction contemplated by this Agreement;

(i) if the legal description attached as Schedule A differs from the legal description of the Property drawn from the Survey, then Seller shall at Closing deliver (in addition to the Deed) a quitclaim deed, in form and content reasonably satisfactory to Purchaser and Seller, conveying the Real Property pursuant to the legal description drawn from the Survey; and

(j) deliver to Purchaser possession and occupancy of the Property, subject only to the Permitted Exceptions.

**4.5 Purchaser's Obligations at Closing.** At Closing, Purchaser shall:

(a) deliver to Seller such evidence as Seller's counsel and/or the title company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser;

(b) deliver such additional documents as shall be reasonably requested by the title company or Seller or required to consummate the transaction contemplated by this Agreement, provided, however, that in no event shall Purchaser be required to undertake

any other material liability not expressly contemplated in this Agreement, unless Purchaser elects to do so in its sole discretion.

**4.6 Credits and Prorations.**

(a) All income and expenses in connection with the operation of the Property shall be apportioned, as of 12:01 A.M., on the Closing Date, as if Purchaser were vested with title to the Property during the entire Closing Date, such that, except as otherwise expressly provided to the contrary in this Agreement, Seller shall have the benefit of income and the burden of expenses for the day preceding the Closing Date and the Purchaser shall have the benefit of income and the burden of expenses for the Closing Date and thereafter. The items below will be prorated at Closing utilizing the information known at that time, and a post-closing "true-up" shall take place on or before the date that is ninety (90) days after the Closing Date (or such later date, if needed) to adjust said prorations, if necessary. Such prorated items shall include, without limitation, the following:

(1) ad valorem taxes and assessments levied against the Property for the tax year in which Closing occurs;

(2) any utility costs and other operating expenses or other items pertaining to the Property which are customarily prorated between a purchaser and a seller in the area in which the Property is located; and

(3) if applicable, annual assessments or similar periodic charges under any private covenants, conditions, restrictions or easements affecting the Property.

(b) Notwithstanding anything contained in the foregoing provisions:

(1) Any ad valorem taxes paid at or before Closing shall be prorated based upon the amounts actually paid. If taxes and assessments for the current year have not been paid before Closing, Seller shall be charged at Closing an amount equal to that portion of such taxes and assessments which relates to the period before Closing and Purchaser shall pay the taxes and assessments before their becoming delinquent. Any such apportionment made with respect to a tax year for which the tax rate or assessed valuation, or both, have not yet been fixed shall be based upon the tax rate and/or assessed valuation last fixed. To the extent that the actual taxes and assessments for the current year differ from the amount apportioned at Closing, the parties shall make all necessary adjustments by appropriate payments between themselves following Closing.

(2) If after Closing any ad valorem taxes or other assessments with respect to the Property are or become due for the year of Closing or prior years, then Seller shall pay to Purchaser, on or before the date that is ten (10) days after receipt of Purchaser's statement of such taxes and/or assessments, (i) the full amount of such additional taxes and/or other assessments for any year before the year of Closing and (ii) Seller's share of any such additional taxes and/or other

assessments for the year of Closing, prorated in the manner set forth above; and such obligation of Seller shall not merge with the deed(s) to be delivered under this Agreement but shall survive Closing.

(c) The provisions of this Section 4.6 shall survive Closing.

**4.7 Closing Costs.**

(a) Seller shall pay (i) the fees of any counsel representing Seller in connection with this transaction, (ii) all applicable transfer taxes, documentary stamp taxes and similar charges relating to the transfer of the Property, (iii) the costs of curing all title objections for which Seller is responsible under this Agreement, and (iv) the costs of recording all mortgage cancellations, if applicable, and all recordable documents contemplated by this agreement.

(b) Purchaser shall pay (i) the fees of any counsel representing Purchaser in connection with this transaction, (ii) the premium for the Title Policy and for any lender's title policy, (iv) the cost of Purchaser's inspections of the Property, (v) the cost of the Survey, and (vi) the costs of any financing obtained by Purchaser.

(c) Except as otherwise provided in this Agreement, all other costs and expenses incident to this transaction and Closing shall be paid by the party incurring same.

**4.8 Conditions Precedent to Obligation of Purchaser.** The obligation of Purchaser to consummate the transaction under this Agreement shall be subject to the fulfillment on or before the Closing Date (or such earlier time as otherwise required by this Agreement) of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

(a) Seller shall have delivered to Purchaser all of the items required to be delivered to Purchaser by Seller or Seller's agents pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.4.

(b) All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date, as if made and updated as of the Closing Date.

(c) Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the Closing Date.

(d) All other conditions precedent to Purchaser's obligation to consummate the transaction under this Agreement (if any) which are set forth in this Agreement shall have been satisfied on or before the Closing Date.

If any of the foregoing conditions has not been satisfied on or before the Closing Date (or such other time as otherwise required by this Agreement) other than through failure of Purchaser to materially comply with its obligations under this Agreement, Purchaser may elect, at

Purchaser's option, to (i) terminate this Agreement by written notice given to Seller on the Closing Date, whereupon the parties shall have no further rights, duties or obligations under this Agreement, other than those that are expressly provided in this Agreement to survive the termination of this Agreement, or (ii) extend the Closing Date for up to thirty (30) days to allow for the satisfaction of any such unsatisfied condition(s); provided, however, if any such condition(s) remain unsatisfied thereafter, Purchaser may elect to terminate this Agreement by written notice given to Seller on the then-scheduled Closing Date, whereupon the parties shall have no further rights, duties or obligations under this Agreement, other than those that are expressly provided in this Agreement to survive the termination of this Agreement. Notwithstanding the foregoing, if any of the foregoing conditions has not been satisfied due to the default of Seller, then Purchaser's rights, remedies and obligations shall instead be determined in accordance with Article 6.

**4.9 Conditions Precedent to Obligation of Seller.** The obligation of Seller to consummate the transaction under this Agreement shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

(a) Purchaser shall have delivered to Seller all of the items required to be delivered to Seller by Purchaser or Purchaser's agents pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.5.

(b) All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date, as if made and updated as of the Closing Date.

If any of the foregoing conditions has not been satisfied on or before the Closing Date (or such other time as otherwise required by this Agreement) other than through failure of Seller to fully comply with its obligations under this Agreement, Seller shall have the right to terminate this Agreement by written notice given to Purchaser on the Closing Date, whereupon the parties shall have no further rights, duties or obligations under this Agreement, other than those which are expressly provided in this Agreement to survive the termination of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a default by Purchaser, then Seller's respective rights, remedies and obligations shall instead be determined in accordance with Article 6.

## ARTICLE 5

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**5.1 Representations and Warranties of Seller.** Seller makes, as of the Effective Date, the following representations and warranties to Purchaser, which representations and warranties shall be updated as of the Closing Date pursuant to Seller's Closing Certificate. Such representations and warranties are subject to those matters disclosed in Seller's disclosure statement as Schedule 5.1 ("*Seller's Disclosure Statement*").

(a) **Organization and Authority.** Seller has been duly organized and is validly existing and in good standing as a nonprofit corporation under the laws of the State of Florida and Seller is qualified to conduct business in the state in which the Property is located. Seller has the full right and authority to enter into this Agreement and to transfer the Property pursuant to this Agreement and to consummate or cause to be consummated the transaction contemplated in this Agreement. The person signing this Agreement on behalf of Seller is authorized to do so. Neither the execution and delivery of this Agreement nor any other documents executed and delivered, or to be executed and delivered, by Seller in connection with the transaction described in this Agreement, will violate (i) any provision of Seller's organizational documents; or (ii) any material agreements, regulations, or laws to or by which Seller is bound. This Agreement has been duly authorized, executed and delivered by Seller, and, assuming the due execution and delivery of this Agreement by Purchaser, is a valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms subject to (a) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws affecting the rights of creditors generally; and (b) the exercise of judicial discretion in accordance with general principles of equity.

(b) **Consents.** Seller has obtained all consents and permissions (if any) related to the transaction contemplated in this Agreement and required under Seller's organizational documents or any covenant, agreement, encumbrance, law or regulation by which Seller or the Property is bound.

(c) **Pending Actions.** Except as set forth on Schedule 5.1(c), no action, suit, arbitration, administrative or judicial proceeding, or unsatisfied order or judgment is pending or, to Seller's knowledge, threatened against Seller or the Property or which otherwise pertains to the Property or the transaction contemplated by this Agreement.

(d) **Condemnation.** Seller has received no notice of, nor to the best of Seller's knowledge is there, any pending, threatened or contemplated action by any governmental authority or agency having the power of eminent domain, which might result in any part of the Property being taken by condemnation or conveyed in lieu of condemnation or concern the widening, change of grade or limitation on the use of streets abutting the Property. Seller shall, promptly upon receiving any such notice or learning of any such contemplated or threatened action, give Purchaser written notice of such contemplated or threatened action.

(e) **No Assessments.** To Seller's knowledge, no assessments have been made against any portion of the Property which are unpaid (except ad valorem taxes for the current year, if any, that are not currently due and payable), whether or not they have become liens; and Seller shall notify Purchaser upon learning of any such assessments. Seller has not filed any pending notices of protest against real property tax assessments with respect to the Real Property, nor has Seller engaged anyone to file such a protest (other than protests which have been concluded).

(f) **Existing Agreements; Service Contracts.** There are no leases, service contracts, maintenance contracts, management agreements, occupancy agreements or other agreements or understandings relating to the Property that will be binding on Purchaser or the Property on or after the Closing Date, except for the Permitted Exceptions.

(g) **Environmental Matters**. Except as may be set forth in those environmental reports and other matters, if any, identified on Schedule 5.1(g) (collectively, the "*Environmental Reports*"), (i) Seller has received no written notice from any governmental authority, neighboring property owner or other party asserting any violation of Environmental Laws related to the Property, (ii) Seller has not commissioned any study or investigation relating to the presence or absence of Hazardous Materials on the Property, (iii) to Seller's knowledge, no areas on the Property exist where Hazardous Materials have been generated, disposed of, released or found, and no Hazardous Materials are present or have been released in a reportable quantity, where such a quantity has been established by Environmental Laws, at, on or under the Property, (iv) to Seller's knowledge, there are no areas on the Property for the storage or disposal of any Hazardous Materials, (v) Seller has no knowledge that the Property, or current or former operations on the Property, are not or have not been in compliance with Environmental Laws or that Seller has liability with respect thereto, (vi) to Seller's knowledge, neither Seller nor the Property is in violation of any Environmental Laws and there is no asbestos, PCB's or lead paint on the Property or any part of the Property, (vii) to Seller's knowledge, there are no storage tanks located on the Property, either above or below ground, or any underground pipes or lines on the Property, active or abandoned, and (viii) to Seller's knowledge, the Property previously has not been used as a landfill or as a dump for garbage or refuse. The term "*Environmental Laws*" shall mean the Resource Conservation and Recovery Act (42 U.S. § 6901 et seq.), as amended by the Hazardous and Solid Waste Amendments of 1984; the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S. § 9601 et seq.), as amended by the Superfund Amendments and Reauthorization Act of 1986; the Hazardous Materials Transportation Act (49 U.S. § 1801 et seq.); the Toxic Substance Control Act (15 U.S. § 2601 et seq.); the Clean Air Act (42 U.S. § 9402 et seq.); the Clean Water Act (33 U.S. § 1251 et seq.); the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S. § 136 et seq.); the Occupational Safety and Health Act (29 U.S. § 651 et seq.); and all other applicable federal, state and local environmental laws (including, without limitation, obligations under the common law), ordinances, orders, rules and regulations, as any of the foregoing may have been amended, supplemented or supplanted prior to the Closing, relating to regulation or control of hazardous, toxic or dangerous substances, materials or wastes (collectively, "*Hazardous Materials*"), or their handling, storage or disposal or to environmental health and safety.

(h) **Conflicts.** There is no agreement to which Seller is a party, or binding on Seller, which is in conflict with this Agreement.

(i) **Contractors and Suppliers.** Except as set forth on Schedule 5.1(i), all contractors, subcontractors, suppliers, architects, engineers, and others who have

performed services or labor for or supplied material to Seller with respect to the Property have been paid in full, and all liens arising from any such services, labor or materials (or claims with which the passage of time or notice or both could mature into liens) have been satisfied and released.

(j) **Permits and Legal Compliance.** Seller has not received written notice of an intention of any governmental authority to revoke any license, permit or certificate required for the development, use, operation or occupancy of the Property. Seller has not received any written notice that the Property is in violation of any zoning, building, fire, health, environmental or other law, statute, ordinance, regulation or order of any governmental or public authority applicable to the Property or any private covenants or restrictions encumbering the Property that remains uncured.

(k) **Financial Status.** Seller is solvent, has not made a general assignment for the benefit of its creditors, and has not admitted in writing its inability to pay its debts as they become due. Seller has neither filed, nor does it contemplate the filing of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or any other proceeding for the relief of debtors in general, nor has any such proceeding been instituted by or against Seller, nor is any such proceeding to Seller's knowledge threatened or contemplated. The sale of the Property will not render Seller insolvent.

(l) **OFAC.** Seller is in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (the "*Order*") and other similar requirements contained in the rules and regulations of the office of Foreign Assets Control, Department of the Treasury ("*OFAC*") and in any enabling legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "*Orders*"). Neither Seller nor any other party that directly or indirectly (a) controls Seller, or (b) has an ownership interest in Seller, is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "*Lists*"). Seller has not been determined by competent authority to be subject to the prohibitions contained in the Orders. Seller is not owned or controlled by, or acts for or on behalf of, any party on the Lists or any other party who has been determined by competent authority to be subject to the prohibitions contained in the Orders.

(m) **Property Documents.** Seller has or will deliver to Purchaser true, complete and accurate copies of all documents and information delivered pursuant to Section 3.1(b) of this Agreement

(n) **No Other Representations or Warranties**. Except as otherwise expressly provided in this Agreement, Seller makes no representations or warranties of any kind pertaining to the Property. In the event of Closing, the Property is being sold and accepted by Purchaser in **"AS IS"**, **"WHERE IS"** condition, except as expressly set forth in this Agreement or in documents to be delivered at Closing pursuant to the terms of this

Agreement. Except for the warranties and representations made by Seller in this Agreement or in documents to be delivered at Closing pursuant to this Agreement, Seller expressly disclaims any and all warranties, express or implied, relating in any way to the nature, quality, condition, use or history of the Property.

**5.2 Survival of Seller's Representations and Warranties.** The representations and warranties of Seller set forth in Section 5.1 shall survive Closing for a period of one (1) year, unless notice setting forth a specific claim under any such representation or warranty shall be given to Seller within that period, in which case such representation or warranty shall survive until such claim is finally and fully resolved.

**5.3 Covenants of Seller.** Seller covenants with Purchaser, from the Effective Date until Closing or earlier termination of this Agreement, as follows:

(a) **Maintenance of Property.** Seller shall maintain the Property in the ordinary course of business consistent with Seller's past practices before the Effective Date, and in all events, in compliance with applicable law.

(b) **Provide Copies of Notices.** Seller shall furnish Purchaser with a copy of all written notices received by Seller from any governmental authority or other party of any violation of any law, statute, ordinance, regulation or order of any governmental or public authority relating to the Property on or before the date that is five (5) business days after Seller's receipt of such notice, but, if received by such date, in no event later than two (2) business days before the Closing Date.

(c) **Execution of New Contracts.** Seller shall not, without Purchaser's prior written consent in each instance (which consent may be withheld in Purchaser's sole discretion), enter into any contract or agreement that will be an obligation affecting the Property or binding on Purchaser after Closing.

(d) **Maintenance of Permits.** Seller shall maintain in existence all of Seller's licenses, permits and approvals that are now in existence with respect to, and are required for, the ownership or operation of the Property, and are of a continuing nature.

(e) **Disposition of the Property and Other Matters.** For so long as this Agreement remains in force, Seller shall not:

(1) sell, assign, rent, lease, convey (absolutely or as security), grant a security interest in, or otherwise encumber or dispose of, the Property (or any interest or estate in the Property), change or request a change in the zoning classification of the Property or any development restrictions applicable to the Property, or consent to or acquiesce in any of the foregoing;

(2) enter into any contract that will be an obligation affecting the Property or binding on Purchaser after Closing; or

(3) enter into any new lease, license or occupancy agreement of all or any part of the Property.

**5.4 Representations and Warranties of Purchaser.** Purchaser makes the following representations and warranties to Seller as of the Effective Date, which representations and warranties shall be updated as of the Closing Date pursuant to Buyer's Closing Certificate:

(a) **Organization and Authority.** Purchaser has been duly organized and is validly existing as a corporation under the laws of the State of Florida. Purchaser has the full right and authority to enter into this Agreement and to purchase the Property pursuant to this Agreement and to consummate or cause to be consummated the transaction contemplated in this Agreement. The person signing this Agreement on behalf of Purchaser is authorized to do so. Neither the execution and delivery of this Agreement, nor any other documents executed and delivered, or to be executed and delivered, by Purchaser in connection with the transaction described in this Agreement, will violate any provision of Purchaser's organizational documents or of any agreements, regulations, or laws to or by which Purchaser is bound. This Agreement has been duly authorized, executed and delivered by Purchaser, is a valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws affecting the rights of creditors generally; and (ii) the exercise of judicial discretion in accordance with general principles of equity.

(b) **Consents.** Subject to Purchaser's customary internal approval process for real estate purchases, Purchaser has obtained all consents and permissions (if any) related to the transaction contemplated in this Agreement and required under Purchaser's organizational documents or any covenant, agreement, encumbrance, law or regulation by which Purchaser is bound.

(c) **Pending Actions.** There is no action, suit, arbitration, administrative or judicial administrative proceeding, or unsatisfied order or judgment pending or, to Purchaser's actual knowledge, threatened against Purchaser or the transaction contemplated by this Agreement, which, if adversely determined, could individually or in the aggregate have a material adverse effect on Purchaser's ability to consummate the transaction contemplated in this Agreement.

(d) **OFAC.** Purchaser is in compliance with the Orders. Neither Purchaser nor any other party that directly or indirectly (a) controls Purchaser, or (b) has an ownership interest in Purchaser, is listed on the Lists; provided, however, Purchaser makes no representation with respect to any shareholder of publicly traded securities. Purchaser has not been determined by competent authority to be subject to the prohibitions contained in the Orders. Purchaser is not owned or controlled by, or acts for or on behalf of, any party on the Lists or any other party who has been determined by competent authority to be subject to the prohibitions contained in the Orders.

(e) **Contractors and Suppliers.** All contractors, subcontractors, suppliers, architects, engineers, and others who have performed services or labor for or supplied material to Purchaser with respect to the Property have been paid in full, and all liens arising from any such services, labor or materials (or claims with which the passage of time or notice or both could mature into liens) have been satisfied and released.

(f) **Permits and Legal Compliance.** Purchaser has not received written notice of an intention of any governmental authority to revoke any license, permit or certificate required for the development, use, operation or occupancy of the Property by Purchaser. Purchaser has not received any written notice that the Property is in violation of any zoning, building, fire, health, environmental or other law, statute, ordinance, regulation or order of any governmental or public authority applicable to the Property or any private covenants or restrictions encumbering the Property that remains uncured.

(g) **Environmental Matters.** (i) Purchaser has received no written notice from any governmental authority, neighboring property owner or other party asserting any violation of Environmental Laws related to the Property, (ii) Purchaser has not commissioned any study or investigation relating to the presence or absence of Hazardous Materials on the Property, (iii) to Purchaser's knowledge, no areas on the Property exist where Hazardous Materials have been generated, disposed of, released or found, and no Hazardous Materials are present or have been released in a reportable quantity, where such a quantity has been established by Environmental Laws, at, on or under the Property, (iv) to Purchaser's knowledge, there are no areas on the Property for the storage or disposal of any Hazardous Materials, (v) Purchaser has no knowledge that the Property, or current or former operations on the Property, are not or have not been in compliance with Environmental Laws or that Purchaser has liability with respect thereto, (vi) to Purchaser's knowledge, neither Purchaser nor the Property is in violation of any Environmental Laws and there is no asbestos, PCB's or lead paint on the Property or any part of the Property, (vii) to Purchsaer's knowledge, there are no storage tanks located on the Property, either above or below ground, or any underground pipes or lines on the Property, active or abandoned, and (viii) to Purchaser's knowledge, the Property previously has not been used as a landfill or as a dump for garbage or refuse.

**5.5 Survival of Purchaser's Representations and Warranties.** The representations and warranties of Purchaser set forth in Section 5.4 shall survive Closing for a period of one (1) year after Closing, unless notice setting forth a specific claim under any such representation or warranty shall be given to Purchaser within that period, in which case such representation or warranty shall survive until such claim is finally and fully resolved.

## ARTICLE 6

## DEFAULT

**6.1 Default by Purchaser**. If the sale of the Property as contemplated under this Agreement is not consummated due to Purchaser's default under this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such default, to terminate this Agreement. Seller

waives and releases any right to (and covenants that it shall not) sue Purchaser: (i) for specific performance of this Agreement, or (ii) to recover any damages of any nature or description.

**6.2 Default by Seller.** If the sale of the Property as contemplated under this Agreement is not consummated due to Seller's default under this Agreement, then Purchaser may exercise any rights or remedies of Purchaser under this Agreement, at law or in equity. Without limitation on the foregoing, Purchaser shall have the right to seek specific performance of this Agreement, injunctive relief and other equitable remedies.

**6.3 Notice of Default; Opportunity to Cure.** Neither Seller nor Purchaser shall be deemed to be in default under this Agreement until and unless such party has been given written notice of its failure to comply with the terms of this Agreement and thereafter does not cure such failure on or before the date that is five (5) business days after receipt of such notice; provided, however, that this Section 6.3 shall not have the effect of extending the Closing Date.

## ARTICLE 7

## RISK OF LOSS

**7.1 Risk of Loss.** Until the purchase of the Property has been consummated on the Closing Date, all risk of loss of, damage to, or destruction of, the Property (whether by fire, flood, tornado or other casualty, or by the exercise of the power of eminent domain, or otherwise) shall belong to and be borne by Seller. For purposes of this Agreement, any contamination of the Property with Hazardous Materials, or release or discharge at the Property of Hazardous Materials, occurring on or after the Effective Date shall constitute a casualty.

**7.2 Casualty or Condemnation.** In the event of any damage to or destruction of the Property or any material portion of the Property or in the event of any taking or threat of taking by condemnation (or any conveyance in lieu of condemnation) of any portion of the Property (or any interest in or rights appurtenant to the Property) by anyone having the power of eminent domain, Purchaser shall, by written notice to Seller delivered on or before the date that is ten (10) business days after receiving written notice from Seller of such event, elect to: (i) terminate this Agreement and all of Purchaser's obligations under this Agreement, whereupon this Agreement shall terminate and Purchaser and Seller shall have no further rights and obligations under this Agreement except those which expressly survive termination of this Agreement; or (ii) consummate the purchase of the Property. If Purchaser does not elect to terminate this Agreement pursuant to clause (i) of this Section 7.2, then Seller shall on the Closing Date pay to Purchaser all insurance proceeds then received by Seller and all condemnation awards and compensation then received by Seller. In addition, Seller shall transfer and assign to Purchaser, in form reasonably satisfactory to Purchaser, all rights and claims of Seller with respect to payment for damages and compensation on account of such damage, destruction or taking.

**7.3 Notice of Condemnation or Casualty.** Seller shall notify Purchaser immediately upon Seller's receiving notice of the occurrence or existence of any damage, destruction, condemnation or threat of condemnation affecting the Property and, at the same time, shall provide

Purchaser with such information with respect thereto as is in Seller's possession to aid Purchaser in making, on an informed basis, the election between the alternatives provided by clauses (i) and (ii) in Section 7.2. Notwithstanding anything in this Agreement to the contrary, Purchaser shall have ten (10) business days after it receives such information from Seller within which to elect between such alternatives, and, accordingly, the Closing Date shall be postponed, if and to the extent necessary, to allow Purchaser such a ten (10) business day period in which to make the election under Section 7.2.

## ARTICLE 8

## MISCELLANEOUS

**8.1 Public Disclosure.** Before Closing, any press release or similar public announcement with respect to the transaction contemplated in this Agreement or any matters set forth in this Agreement will be made only in the form mutually approved by Purchaser and Seller. Notwithstanding anything to the contrary in this Agreement, Purchaser shall have the right to make all disclosures with regard to the transaction contemplated in this Agreement as are required under applicable law and regulation, including, without limitation, all applicable laws and regulations relating to securities, securities exchanges and the issuers of securities.

**8.2 Notices.** Any notice, demand, request or other communication (a "*notice*") required or permitted to be given under this Agreement shall be in writing and shall be delivered by hand or overnight courier (such as United Parcel Service or Federal Express), sent by electronic mail or mailed by United States registered or certified mail, return receipt requested, postage prepaid and addressed to each party at its address as set forth below. All notices delivered by hand shall be deemed given upon the date so received; those given by commercial courier as provided above shall be deemed given on the date deposited; and those given by electronic mail shall be deemed given on the date of electronic mail transmittal. Nonetheless, the time period, if any, in which a response to any notice must be given shall commence to run from the date of receipt of the notice by the addressee of such notice. Any notice not received because of changed address or electronic mail address of which no notice was given as provided above or because of refusal to accept delivery shall be deemed received by the party to whom addressed on the date of hand delivery, on the first calendar day after deposit with commercial courier, or on the date of electronic mail transmittal, as the case may be. By giving at least five (5) days' prior written notice, any party may from time to time and at any time change its mailing address under this Agreement. Any notice of any party may be given by such party's counsel.

The parties' respective addresses for notice purposes are as follows.

If to Purchaser: The Frazer School, Inc.<br>4700 NW 89th Blvd.<br>Gainesville, FL 32606<br>Attention: Olanrewaju Fayiga<br>Email: fayigaoi@frazerschool.org

with a copy to:

Eversheds Sutherland (US) LLP
999 Peachtree Street, NE
Suite 2300
Atlanta, GA 30309
Attn: Rachel Reid
Email: RachelReid@eversheds-sutherland.com

If to Seller:

**Newberry Christian Community School, Inc.**
1520 NW 34th Street
Gainesville, Florida 32605
Attention: James R. Schrader, President
Telephone: (850) 758-1219
Email: jrschr10@gmail.com

with a copy to:

**Withers Harvey, P.A.**
1120 NW 8th Avenue
Gainesville, Florida 32601
Attention: Richard I. Withers
Telephone: (352) 727-4404
Email: richard@withersharvey.com

**8.3 Modifications.** This Agreement cannot be changed orally, and no agreement shall be effective to waive, change, modify or discharge it in whole or in part unless such agreement is (i) in writing, (ii) identified as a waiver, change, modification or discharge of this Agreement, as applicable, and (iii) is signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

**8.4 Calculation of Time Periods.** Unless otherwise specified in this Agreement, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday under the laws of the State in which the Property is located, in which event the period shall run until the end of the next business day. The final day of any such period shall be deemed to end at 6:00 p.m. (Gainesville, Florida local time). As used in this Agreement, the term "*business day*" shall be deemed to mean any day, other than a Saturday or Sunday or a day on which commercial banks in the State of Florida are authorized to be closed for business.

**8.5 Successors and Assigns.** The terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties to this Agreement.

**8.6 Entire Agreement.** This Agreement, including the Schedules and Exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

**8.7 Further Assurances.** Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement. Without limiting the generality of the foregoing, Purchaser shall, if requested by Seller, execute acknowledgments of receipt with respect to any materials delivered by Seller to Purchaser with respect to the Property. The provisions of this Section 8.7 shall survive Closing.

**8.8 Counterparts; Electronic Signatures Binding.** To facilitate execution of this Agreement, this Agreement may be executed in multiple counterparts, each of which, when assembled to include an original or electronic mail (in .PDF or similar file) signature for each party contemplated to sign this Agreement, will constitute a complete and fully executed agreement. All such fully executed original or electronic mail (in .PDF or similar file) counterparts will collectively constitute a single agreement, and such signatures shall be legally binding upon the party sending the signature by such electronic means immediately upon being sent by such party. Further, the parties agree that signatures by DocuSign, Sign-n-Send or other similar electronic signing software will be deemed to be originals.

**8.9 Severability.** If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

**8.10 Applicable Law.** This Agreement is performable in the state in which the Property is located and shall in all respects be governed by, and construed in accordance with, the substantive federal laws of the United States and the laws of such state. Seller and Purchaser irrevocably submit to the jurisdiction of any state or federal court sitting in the state and judicial district in which the Property is located in any action or proceeding arising out of or relating to this Agreement and irrevocably agree that all claims in respect of such action or proceeding shall be heard and determined in a state or federal court sitting in the state and judicial district in which the Property is located. Purchaser and Seller agree that the provisions of this Section 8.10 shall survive Closing of the transaction contemplated by this Agreement.

**8.11 No Third Party Beneficiary.** The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

**8.12 Exhibits and Schedules.** The following schedules or exhibits attached to this Agreement shall be deemed to be an integral part of this Agreement:

| | | |
|---|---|---|
| **Schedule A** | - | Legal Description of the Land |
| **Schedule 2.4** | - | Required Title Policy Endorsements |
| **Schedule 3.1(b)** | - | Property Documents |
| **Schedule 4.2** | - | Noteholders |
| **Schedule 4.4(a)** | - | Form of Limited Warranty Deed |
| **Schedule 4.4(b)** | - | Form of Bill of Sale and Assignment |
| **Schedule 4.4(c)** | - | Form of Seller's Closing Certificate |

| | | |
|---|---|---|
| **Schedule 5.1** | - | Seller's Disclosure Statement |
| **Schedule 5.1(g)** | - | Environmental Reports |

**8.13 Captions.** The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any section or any subsection of this Agreement.

**8.14 Construction.** The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits, schedules or amendments to this Agreement.

**8.15 Termination of Agreement.** It is understood and agreed that if either Purchaser or Seller terminates this Agreement pursuant to a right of termination granted under this Agreement, such termination shall operate to relieve Seller and Purchaser (in which event the defaulting party shall remain liable as provided in this Agreement) from all obligations under this Agreement, except for such obligations as are specifically stated in this Agreement to survive the termination of this Agreement.

**8.16 Survival.** All provisions of this Agreement which are not fully performed as of Closing shall survive Closing subject to the terms and provisions set forth in Sections 5.2 and 5.5 respectively.

**8.17 Time of Essence.** Time is of the essence with respect to this Agreement.

**8.18 Legal Fees.** In the event of any legal action or proceeding instituted with respect to this Agreement, the party prevailing in such action or proceeding shall be entitled to collect from the non-prevailing party reasonable attorney fees, paralegal fees, law clerk fees and other legal costs and expenses, whether incurred at or before trial, and whether incurred at the trail level or in any appellate, bankruptcy, collection or other legal proceedings.

## ARTICLE 9

### INDEMNIFICATION

**9.1** Seller hereby agrees to indemnify and hold Purchaser harmless against and in respect of any and all debts, claims, actions, losses, costs, damages, expenses, deficiencies or liabilities incurred by Purchaser as a result of or relating to (i) Seller's ownership of the Property prior to Closing, (ii) any material misrepresentation, breach of warranty or non-fulfillment of any covenant or agreement on the part of Seller under this Agreement, or (iii) any misrepresentation contained in or occasioned by any certificate or other instrument furnished or to be furnished by Seller to Purchaser under this Agreement, and any and all assessments, judgments, costs and other reasonable expenses incidental to any of the foregoing, including, but not limited to, reasonable attorneys' fees, paralegal fees, law clerk fees and other legal costs and expenses.

**9.2** Purchaser hereby agrees to indemnify and hold Seller harmless against and in respect of any and all debts, claims, actions, losses, costs, damages, expenses, deficiencies or liabilities incurred by Seller as a result of or relating to (i) Purchaser's ownership of the Property after Closing, (ii) any

material misrepresentation, breach of warranty or non-fulfillment of any covenant or agreement on the part of Purchaser under this Agreement, or (iii) any misrepresentation contained in or occasioned by any certificate or other instrument furnished or to be furnished by Purchaser to Seller under this Agreement, and any and all assessments, judgments, costs and other reasonable expenses incidental to any of the foregoing, including, but not limited to, reasonable attorneys' fees, paralegal fees, law clerk fees and other legal costs and expenses.

[signatures commence on following page]

IN WITNESS WHEREOF, the parties to this Agreement have duly executed this Agreement as of the Effective Date.

**PURCHASER:**

The Frazer School, Inc.,
a Florida corporation

By: ____________________________
Name: ___________________________
Title: ___________________________

[signatures continued on the following pages]

**SELLER:**

Newberry Christian Community School, Inc.,
a Florida nonprofit corporation

By: ____________________________
Name: ___________________________
Title: ____________________________

[signatures continued on the following pages]

# **SCHEDULE A**

## Legal Description of Land

[*INSERT LEGAL DESCRIPTION. TO BE COMPLETED PRIOR TO CLOSING]

# SCHEDULE 2.4

## Required Title Policy Endorsements

[TO BE COMPLETED PRIOR TO CLOSING]

1. [*Zoning – Unimproved Land – ALTA 3] ***or*** [*Zoning – Completed Structure – ALTA 3.1] ***or*** [*Zoning – Land Under Development – ALTA 3.2]
2. Commercial Environmental Protection Lien – ALTA 8.2-06
3. [*Covenants, Conditions and Restrictions – Unimproved Land – ALTA 9.1-06] ***or*** [*Covenants, Conditions and Restrictions – Improved Land – ALTA 9.2-06] ***or*** [*Covenants, Conditions and Restrictions – Land Under Development – ALTA 9.8-06]
4. Private Rights – ALTA 9.9-06
5. Access and Entry – ALTA 17-06
6. [*Single Tax Lot – ALTA 18-06] ***or*** [*Multiple Tax Parcel – ALTA 18.1-06 or 18.2-06]
7. [*Contiguity – Multiple Parcels – ALTA 19-06] ***or*** [*Contiguity – Single Parcel – ALTA 19.1-06]
8. Same as Survey – ALTA 25-06
9. Subdivision – ALTA 26
10. Policy Authentication – ALTA 39-06
11. Waiver of Arbitration
12. "Gap" Coverage

**SCHEDULE 3.1(b)**

**Property Documents**

1. Copies of all tax bills for the Property for the last three (3) years;

2. Copies of all environmental reports related to the Property;

3. Copies of all surveys, plats, subdivision plats, site plans and topographical maps related to the Property;

4. Copies of all soils, geological and engineering reports related to the Property;

5. Information regarding current zoning of the Property and other relevant land-use information;

6. Copies of all utility agreements and reservations related to the Property;

7. Copies of all title insurance policies and title exception documents for the Property; and

8. If applicable, copies of all leases of all or any part of the Property and other agreements relating to the use and operation of all or any part of the Property.

# **<u>SCHEDULE 4.2</u>**

## **Noteholders**

[TO BE COMPLETED PRIOR TO CLOSING]

# SCHEDULE 4.4(a)

**Form of Special Warranty Deed**

**When recorded, return to:**

____________________
____________________
____________________
____________________

**Tax Parcel Number: ____________________**

## LIMITED WARRANTY DEED

THIS LIMITED WARRANTY DEED, made this ___ day of ___________, 2026, between **Newberry Christian Community School, Inc.**, a Florida nonprofit corporation ("*Grantor*"), and **The Frazer School, Inc.**, a Florida corporation ("*Grantee*"; the words "*Grantor*" and "*Grantee*" to include their respective heirs, successors and assigns where the context requires or permits);

WITNESSETH:

For and in consideration of the sum of $10.00 and other good and valuable consideration delivered to Grantor by Grantee at and before the execution, sealing and delivery hereof, the receipt and sufficiency of which are hereby acknowledged, Grantor has and hereby does grant, bargain, sell, alien, convey, and confirm unto Grantee, all that tract or parcel of land lying and being in [*Land Lot __ of the ___ Land District of Alachua County, Florida], as more particularly described on Exhibit A (the "*Land*"), subject to all matters set forth on Exhibit B (the "*Permitted Exceptions*").

TO HAVE AND TO HOLD said Land, together with any and all improvements located thereon, and any and all of the rights, members, easements, hereditaments, and appurtenances thereof to the same being, belonging or in anywise appertaining to the only proper use, benefit, and behoof of Grantee, subject to the Permitted Exceptions, forever, in FEE SIMPLE.

AND, SUBJECT TO the Permitted Exceptions, Grantor shall warrant and forever defend the right and title to said Land unto Grantee, against the claims of all persons whomsoever claiming by, through or under Grantor, but not otherwise.

[signature appears on following page]

IN WITNESS WHEREOF, Grantor has executed this Special Warranty Deed under seal as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

______________________________
Witness

______________________________
Notary Public

My Commission Expires:

______________________________
[NOTARIAL SEAL]

**GRANTOR:**

**NEWBERRY CHRISTIAN COMMUNITY SHOOL, INC., a Florida nonprofit corporation**

By: ___________________________ [SEAL]
Name: ________________________
Its: ___________________________

**Exhibits to Special Warranty Deed**

Exhibit A -- Legal Description of the Property

Exhibit B -- Permitted Exceptions

**<u>SCHEDULE 4.4(b)</u>**

**Form of Bill of Sale and Assignment**

**BILL OF SALE AND ASSIGNMENT**

This BILL OF SALE AND ASSIGNMENT (this "*Assignment*") is made and entered into this ____ day of _____, 2026, between Newberry Christian Community School, Inc.**,** a Florida nonprofit corporation ("*Seller*"), and The Frazer School, Inc., a Florida corporation ("*Purchaser*").

**BACKGROUND:**

A. Seller and Purchaser entered into that certain Purchase and Sale Agreement, dated ______ ___, 2026 (as may be amended and/or assigned from time to time, the "*Contract*").

B. Concurrently with the execution and delivery of this Assignment and pursuant to the Contract, Seller is conveying to Purchaser, by Special Warranty Deed, (i) that certain tract or parcel of real property located in Alachua County, Florida, and more particularly described on Exhibit A (the **"***Land*"), (ii) those rights, easements and appurtenances pertaining to the Land (the **"***Related Rights***"**), and (iii) the buildings, structures, fixtures and other improvements, if any, on and within the Land (the "*Improvements*"; and the Land, the Related Rights and the Improvements being sometimes collectively referred to as the "*Real Property*").

C. Seller has agreed to convey to Purchaser certain personal property as set forth in this Assignment.

**AGREEMENT:**

NOW, THEREFORE, in consideration of the receipt of Ten Dollars ($10.00), the assumptions by Purchaser set forth in this Assignment and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Seller and Purchaser agree as follows:

1. **Bill of Sale.** Seller sells, assigns, transfers and conveys to Purchaser all of Seller's right, title and interest in, to and under all governmental and non-governmental permits, licenses, consents, approvals and authorizations, if any, belonging to or inuring to the benefit of Seller and pertaining to the Real Property, to the extent that such permits, licenses, consents and approvals are assignable at no cost by Seller (collectively, the "*Intangible Property*"). Seller warrants to Purchaser that Seller has not sold, transferred, assigned, pledged, encumbered or otherwise conveyed to any third party its right, title and interest in the Intangible Property.

2. **Successors and Assigns.** This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of the parties to this Assignment.

3. **Governing Law.** This Assignment shall be construed under and enforced in accordance with the laws of the State of Florida.

[signatures commence on following page]

EXECUTED effective as of the date first above written.

**SELLER:**

**NEWBERRY CHRISTIAN COMMUNITY SHOOL, INC., a Florida nonprofit corporation**

By: ________________________
Name: ______________________
Title: ______________________

**Exhibits to Bill of Sale and Assignment**

Exhibit A -- Legal Description of the Property

**<u>SCHEDULE 4.2(c)</u>**

**Form of Seller's Closing Certificate**

**CERTIFICATE OF SELLER'S REPRESENTATIONS AND WARRANTIES**

THIS CERTIFICATION is made this ___ day of ___________, 2026 by Newberry Christian Community School, Inc., a Florida nonprofit corporation ("*Seller*"), in favor of and The Frazer School, Inc., a Florida corporation ("*Purchaser*").

Seller certifies that the representations and warranties of Seller set forth in Section 5.1 of that Purchase and Sale Agreement, dated ____________ ___, 2026, between Seller and Purchaser (as may be amended and/or assigned from time to time, the "*Contract*"), are (i) with respect to all such representations and warranties which are not qualified by materiality, true and correct in all material respects as of the date hereof, and (ii) with respect to all such representations and warranties which are qualified by materiality, true and correct in all respects as of the date hereof.

This certificate is delivered pursuant to <u>Section 4.4(c)</u> of the Agreement and shall survive for the period set forth in <u>Section 5.2</u> of the Agreement.

[signature appears on following page]

**SELLER:**

**NEWBERRY CHRISTIAN COMMUNITY SHOOL, INC., a Florida nonprofit corporation**

By: ________________________
Name: ______________________
Title: ______________________

Date of Execution: ____________

**Exhibits to Seller's Closing Certificate**

Exhibit A – Disclosed Items

# SCHEDULE 5.1

## Seller's Disclosure Statement

[TO BE COMPLETED PRIOR TO CLOSING]

[Add Schedule 5.1(c). Pending Actions – Disclose potential or threatened legal actions by Ethan Fieldman, Kurt and Brittany Dudas, IRS re Payroll Taxes, and Parents who have promissory notes.]

# SCHEDULE 5.1(g)

## Environmental Reports

[TO BE COMPLETED PRIOR TO CLOSING]